C.S. v R.H. (2025 NY Slip Op 51426(U))

[*1]

C.S. v R.H.

2025 NY Slip Op 51426(U)

Decided on September 8, 2025

Supreme Court, New York County

Waterman-Marshall, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 8, 2025
Supreme Court, New York County

C.S., Plaintiff,

against
R.H., Defendant.

Index No. xxxxxx/2018

The Plaintiff-Wife is represented by The Law Firm of Laurence P. Greenberg, Laurence P. Greenberg, Esq. [[email protected]] and Seth Ginsberg, Esq. [[email protected]], 299 Broadway, Suite 1405, New York, New York 10007, (212) 608-9000.
The Defendant-Husband is represented by Law Offices of James. J. Sexton, P.C., James J. Sexton, Esq. [[email protected]], 31 Hudson Yards, 11th Floor, New York, New York 10001, (212) 627-5095.

Kathleen Waterman-Marshall, J.

BRIEF BACKGROUND
C.S. ("Wife") and R.H. ("Husband") had a nearly twenty-four-year marriage, much of which, at least on the surface, had tones of a fairy-tale. They started out comfortably, with Husband earning $2 million a year as an equity partner in the investment firm Spear Leeds & Kellogg ("SL&K") and Wife earning $52,000 a year as a financial reporter. The marriage resulted in four daughters [xxx], all of whom are in good health and successful in their own right.
Early in the marriage, the parties' wealth went from comfortable to extravagant when Goldman Sachs purchased SL&K for $6.5 billion, and the family's net worth rocketed to approximately $120 million overnight. Their lifestyle went from Manhattan rich — Manhattan apartment, country home, and Hampton summer home rentals — to uber-rich — living in Europe for several years, several Manhattan apartments, a Hamptons estate with 7.5-acres of waterfront property, real estate investments worth $22 million, and the creation of an investment firm, E.T.C. ("ETC") that trades $5.5 billion in assets, among other assets.
Husband and Wife placed their vast wealth into irrevocable trusts in March 2001: the R.H. 2001 Family Trust ("the Family Trust"), for the benefit of their daughters who would [*2]receive their share of the assets when they reached age 30, and a generation skipping trust, named the R.H. 2001 GST Trust ("the GST"), for the benefit of their grandchildren and which skips their daughters, who are not beneficiaries (collectively and intermittently referred to as "the Trusts"). They intended that the Trusts shelter from estate taxes the majority of their assets accrued during the marriage — valued at over $181 million at the time of trial — while directly benefiting from their use on a daily basis to support the family lifestyle. Indeed, the parties resided in each of the homes owned by the Trusts throughout the marriage, and family expenses were and continue to be paid from the assets held by the Trusts. Husband is the Grantor of the Trusts, with power to remove and replace the Trustee, as well as the Investment Advisor for each of the LLCs owned by the Trusts and which hold the marital assets. As such, and since the outset, he has and continues to actively manage and control the trust assets.
Something went wrong in the marriage; extreme wealth could not fix it. The precise causes and conditions are beyond this Court's purview and no one can really know exactly when and how a marriage comes to an end. Wife filed for divorce in May 2018.
The parties resolved their custody and parental access issues in somewhat short order by Custody Stipulation, dated December 18, 2018, as modified by So-Ordered Modification Agreement dated January 11, 2022 ("the Custody Agreements"). The parties have joint legal custody with an equal parental access schedule (for the two youngest daughters).
The divorce proceedings did not need to be acrimonious and the financial issues could and should have been resolved — there is wealth enough for everyone. A settlement acknowledging each parties' contributions to marital assets, the homes and caretaking of the children, as well as honoring their economic decisions during the marriage, would have been possible, indeed, preferable. It is undisputed that the vast majority of the martial assets are contained in the Trusts and continue to grow in value. However, after Wife commenced this lawsuit, Husband took unilateral actions to systematically cut her out of any involvement in the Trusts and destroy her interest in their assets, and evicted her from the marital homes owned by the Trusts. She has not enjoyed the use or benefit of any trust assets since 2020. In 2023, mid-trial, and without Court approval or notice to and consent of Wife, Husband decanted the Trusts into two new trusts formed under Delaware law.
The question presented on this financial trial is whether, in fashioning an equitable distribution award, the Court can consider the value of martial assets placed into the Trusts, without distributing such assets or dissolving the Trusts (which, even if possible, would have catastrophic results). Although there is no case directly on all fours with this case, a synthesis of the controlling principles compels the Court to answer the question in the affirmative.
TRIAL
The financial trial took place over eight days from October 2022 through April 2024, specifically, October 13, 2022, December 2, 2022, February 23, 2023, February 24, 2023, March 2, 2023, June 14, 2023, April 15 and 16, 2024.[FN1]
The parties submitted their post-trial briefs on September 12, 2024.
In support of her case, Wife offered her testimony and that of real estate appraisers Jeffrey Robinson and Elise Prado. Husband offered his own testimony and that of Dave McCabe, Esq., the parties' trusts and estate attorney, who represented them up to the time of this divorce [*3]action. The Court admitted into evidence 197 exhibits offered by Wife, and 16 exhibits offered by Husband, many on consent. The exhibits included, inter alia, the pleadings; court Orders; the Custody Agreements; the various Trust documents, including the GST and Family Trust, the LLC Operating Agreements, and related notices, appointment letters, removal letters, leases, and correspondence; the 2023 Delaware Property Trust and Investment Trust; appraisals of the parties' various residences; a valuation of ETC; account statements for the parties' various financial and investment accounts; the parties' joint and trust tax returns; and photographs.[FN2]

FINDINGS OF FACT
Credibility
Wife presented as sincere, intelligent, and warm. She testified in a clear, consistent, and straightforward manner on all matters throughout the trial; the Court finds her to be highly credible. Wife maintained a respectful tone and demeanor and was not argumentative or evasive even when challenged or presented with emotionally charged questions on cross-examination.
Wife's testimony about each party's career, the family's finances, and family life early in the marriage, and their finances and lifestyle after the Goldman Sachs buy-out, was clear, specific, and corroborated by the other credible proof in the record, including documents and photographs. She testified in detail about raising the children, her dedication to Husband, and attempts to balance family with her own career — memories which evoked both joy and sadness. She smiled often when speaking about her daughters and the happy times with Husband, and emoted sincere relief for Husband's recovery from serious injuries in 2004 and from cancer in 2016. Her testimony about the work she put into raising the children — their medical and educational needs, extracurriculars, etc. — and the work she put into the various family homes, was also credible and corroborated. Wife impressed as a committed woman who acquiesced to Husband on all things, including his request that she give up her career, which she loved. She was genuinely thankful for the wealth they achieved during the marriage, and visibly devasted by the end of the marriage and Husband's conduct following commencement of this divorce.
As to finances, Wife testified clearly and convincingly that Husband assured her that the Trusts were "tax shelters," that she had a role in the Trusts and their assets, and that the parties would use and enjoy the Trust assets to their benefit. She was equally credible as to how and when she learned about the Trusts and the LLCs, what she knew about the Trusts and LLCs, and what she did not know about them. Her testimony that she took care of the four children and various homes and completely trusted Husband with the family finances, was straightforward, consistent and unrefuted. Similarly, Wife's testimony that she did not have separate legal counsel in the formation of the Trusts and LLCs and was not advised that she needed separate legal counsel therefor, was highly credible and unassailed.
Husband presented as intelligent, accomplished, and confident, with an edge of arrogance and without any of the humility demonstrated by Wife. When questioned by Wife's attorney, Husband appeared frustrated, angry and defensive; he gave the impression that he need not account to anyone for any of his conduct as it relates to his wealth, his financial decisions, and his family. He did not testify at any length or with any great detail about the family life throughout the marriage, or his relationship with Wife. He did not refute Wife's testimony about [*4]her contributions to the marriage, that she was the primary caregiver of the four daughters, or any specifics of their home life and lifestyle.
Husband lacked credibility on the core financial issues, specifically as to the critical matter of his control over the Trusts. The documentary proof on this issue flatly contradicted much of his testimony, which was also internally inconsistent. For instance, Husband admitted that he alone decided who to appoint and remove as Trustee and Managing Director of the LLCs and which assets went into the Trusts and when, and that he alone set the below-market rents for the Trust properties in which the family lived. Yet, when asked whether he controlled Trusts and the Trustee, he became evasive and argumentative, denied any such control and testified that he acted on counsel's advice and that the Trustee made the decisions. However, Husband did not offer the Trustee, his close personal friend T.S., as a witness to corroborate and support Husband's trial testimony.
Similarly, Husband's adamant denial that the Trusts do not fund the family expenses was contradicted by the legion of proof in the record that the Trusts funded, and continue to fund, the family expenses and lifestyle. Husband admitted that he has not worked outside the home since 2002 and does not draw a salary from ETC, his company that trades $5.5 billion in assets.
Husband did not adequately explain why he did not seek court approval for his post-commencement conduct with respect to Trust assets, including, inter alia, removing Wife from the LLCs and evicting her from the Trust homes; paying "distributions"; and, ultimately, decanting the Trusts into two new Trusts formed under Delaware law. He could not explain why, although the parties have joint decision making for their daughters, he alone signed trust documents on behalf of the younger daughters without notice to, or the consent of, Wife.
The Court finds that Mr. Robinson, Ms. Prado, and Mr. McCabe each testified in a clear and credible manner, and credits their testimony.
The Marriage: 1994 - 2000
The parties met in 1992, Wife was 24 and Husband was 32, and both were college educated and gainfully employed. Wife, a graduate of Cornell, worked as a financial reporter with earnings of approximately $52,000 per year. Husband, a graduate of Villanova, was an equity partner and financial professional at SLK and earned approximately $2 million per year. They moved in together in 1993 and were married on September 18, 1994.
At the time of the marriage, Husband owned the 200-acre property at 2075 Route 22A, Hampton, New York, bordering Vermont, which he purchased in 1986 with a friend (who he subsequently bought out) ("the [Upstate] Home"). In 1994, the property had a modest three-bedroom, A-frame house built thereon. During the marriage, the parties expanded the house to a luxurious 5,000 square foot home, built a 1,500 square foot caretaker's cottage, and a 7,000 square foot barn with a heated horse stable.
Soon after their wedding, the parties' relocated to London for about one year for Husband's work. Although Wife loved and was thriving at her job in New York, she gave it up to follow him ("I wanted to be with R." [10/2/22 Tr. 10]) — Wife's acquiescence to Husband's wants and needs was a theme throughout the marriage. She was able to secure employment when in London and again when they returned to New York, but at a cost.
The parties lived quite comfortably during the first six-years of the marriage. After a brief stint living in a high-end hotel, they moved to a high-end rental apartment. In 1998, after the birth of [], their first daughter, they purchased Apartment #8 at 353 Central Park West in Manhattan, a 2,700 square foot, four-bedroom apartment for which they paid $1.7 million cash. [*5]They also hired a live-in nanny. They took luxury vacations, rented homes in the Hamptons for the summers, began renovations on the [Upstate] Home, and owned cars and a sailboat.
Wife continued to work and take care of the family homes and [child], including scheduling and attending medical and educational appointments. Husband continued to work at SL&K, where he was an equity partner. The parties had a joint bank account from which Husband would pay the family expenses. Wife had her own account but also had access to the joint account. They also had several investment accounts, some held in Husband's name and some in joint names, and college savings plans for their nieces and nephews. Husband managed all of the family investments.
The Initial Trusts and Estate Planning
Dave McCabe, Esq., an experienced trusts and estates attorney with Wilkie Farr & Gallagher, LLP, handled the estate matters for many of the SL&K partners, including Husband. In 1995, Mr. McCabe prepared Wills and Health Care Proxies for the parties, created revocable trusts for each party, and set up a private foundation, The R.H. and C.S. Foundation ("the Foundation"). He also prepared trusts for each of the parties' daughters when they were born.
The Goldman Sachs Buy-Out
In September 2000, Goldman Sachs purchased SL&K for $6.5 Billion. Overnight, the parties' wealth skyrocketed to in excess of $120 million, consisting of cash and Goldman Sachs stock. Husband conceded at trial that these funds were marital property.
Husband did not offer any proof that the Goldman Sachs buy-out was occasioned by any of his specific work or efforts, or that he had a hand in the negotiation resulting in a $6.5 billion sales price. Rather, both parties realized an unanticipated financial windfall to their marital assets as a result of the buy-out.
As part of the Goldman Sachs transaction, Husband was required to work for Goldman Sachs for a period of two-years. When he completed this employment in 2002, he "retired" at the age of 42.
The Trusts and Related GRATs and LLCs
Husband, a self-described "hands-on-guy" (2/24/23 Tr. 17) actively manages the family wealth and set up a highly sophisticated estate plan with the assistance of Mr. McCabe. The plan involved the placement of a substantial majority of the marital assets into the GST and the Family Trust, which were created simultaneously in March 2001 (Exhibits 45, 46). The overwhelming proof at trial established that the Trusts were formed to enable the parties to avoid estate taxes upon their demise while allowing them to continue to utilize and benefit from trust assets during their lifetimes, which they did (10/13/22 Tr. 50: trust assets "would be used to maintain our lifestyle and it was just a tax haven basically. That's what I understood"). The parties lived in the real estate owned by the Trusts, rent free for many years. Notwithstanding Husband's denials, the proof established that the family expenses and lifestyle was funded (and continues to be funded) by the Trusts (more on that below).
Mr. McCabe met with both parties twice about the GST. However, Husband was Mr. McCabe's "main point of contact, so, a lot of calls, and correspondence happened to [be with Husband], but . . . I met with both of them, whenever there was a significant activity to take place" (4/15/24 Tr. 16, 154-55). Husband would "toss ideas around" with Mr. McCabe in person or on the phone, then discuss the idea with Wife, before getting together with Mr. McCabe to "settle [] on a concept" (2/24/23 Tr. 45; see also 10/13/22 Tr. 67). According to Wife, Husband would talk to her about his ideas for the Trust assets and investments on the ski lift and at dinner [*6](10/13/22 Tr. 67: "He would share with me his ideas when we were on the ski lift. The exact investments, he would talk same [sic] names, mention names, but I couldn't tell you what exactly he was investing in"; 80: "In all fairness, R. would talk to me about it usually over dinner or on a ski lift and I did not pay attention. Q: And why is that? A: I trusted him, and I had a full plate with the girls and it didn't interest me. I just trusted him and our lifestyle was pretty nice.").
Although Husband claimed that documents would be circulated among him and Wife before they were signed (2/24/23 Tr. 45), Wife testified credibly that she first saw documents when the parties went into Mr. McCabe's office to sign them; she was not provided any documents prior to the meetings (10/13/22 Tr. 46, 49).
Wife received no independent legal or financial advice about the creation of the Trusts and was not advised to obtain independent counsel; she was not informed as to what would happen to the marital assets held in trust in the event of divorce (10/13/22 Tr. 48). Wife testified, credibly and consistently, that she trusted her husband and his assurances that the Trusts were meant to protect their vast marital assets while permitting them to enjoy their use and benefit, that he would manage the assets, and that she had a "role" in the Trusts (10/13/22 Tr. 44, 50: "Honestly, I left all of this to R. As long as I had a role, I felt like I was represented," 79). Husband did not refute Wife's testimony in this regard.
Husband is the Grantor under the Trusts, with the exclusive power to remove and replace the Trustee and Successor Trustee at any time and for any reason (Exhibits 45, 46). He initially appointed Wife as Trustee, and her brother-in-law, a successful financial professional, as Successor Trustee (id.). As Grantor, Husband also retained the right to substitute non-trust assets for trust assets, making it an "intentionally defective grantor trust" (2/24/23 Tr. 49; 4/15/24 Tr. 32-33). In addition, as Grantor, he is the "owner" of the GST assets under federal tax law. Thus, the marital assets transferred into the Trusts were treated as gifts from the parties, and they each used their lifetime gift exemptions — a non-renewable asset — to reduce and defray the taxes on the gift transfers. The GST issued promissory notes to the parties in exchange for the gifts and the parties did not pay taxes on the GTS's interest payments on the notes. However, they did pay taxes on the income generated by the GST throughout the marriage, which reduced the value of the other marital assets and increased the value of the GST (4/15/24 Tr. 14-15, 27-29, 32-37).
As noted, the Trusts were funded with marital assets — the cash and Goldman Sachs stock from the buy-out. Husband initially funded the GST with approximately $1,275,000. In addition, he created the R.H. Family LLC (the "Family LLC"), which he funded with cash in the amount of $1,194,738 and 208,667 shares of Goldman stock worth approximately $18,621,443 million, for a combined total of just under $20 Million (Exhibit 50). He then sold 99% of the Family LLC to the GST in exchange for a promissory note in the sum of $11,633,041, representing a 41.5% discount of the market value of the stock due to restrictions thereon at the time of the transfer (Exhibit 50). Though advantageous from an estate tax planning standpoint, the discounted sales price resulted in the parties taking a promissory note worth substantially less than the assets they transferred to the GST. In addition, Husband forgave portions of the promissory note at various times throughout the marriage (2/24/23 Tr. 40-41).
By 2001, Husband had transferred $20 million into the GST.
The GRATs
Husband formed two Grantor Retained Annuity Trusts ("GRATs") to facilitate transfer of marital assets into the GST over the course of time. On March 15, 2001, he created the 2001 GRAT, named himself trustee, and funded it with 86,228 shares of Goldman stock worth [*7]$6,167,255 (Exhibit 50). On June 11, 2002, he created the 2002 GRAT, named himself trustee, and funded it with 45,157 shares of Goldman stock worth $3,255,820 (Exhibit 50). The GRATs each had two-year terms and, upon their expirations in 2003 and 2004, respectively, the assets were transferred to the Family Trust (Exhibit 50).
Thus, by 2004, Husband had transferred at least approximately $30 million into the GST: the initial $20 million in 2001, and additional $10 million from the GRATs.
Wife testified credibly that she does not know what a GRAT is (10/13/22 Tr. 51) and the record is devoid of proof that she was involved in their formation.
The LLCs
Husband also formed a series of limited liability companies to hold marital assets and permit him to conduct business and financial transactions. As interests in LLCs can be transferred for an amount less than the value of the assets held by the LLC, Husband utilized the LLC structure as a means to place the parties' marital assets into the GST for a discount (4/15/24 Tr. 29-30).
During the period from 2004 through 2016, Husband created five LLCs, as set forth in more detail below: M.B. Holdings LLC ("M.B."); A.D., LLC ("A.D."); C. [] Holdings LLC ("C.H."); P.A. LLC ("P.A."); and H.H. LLC ("H.H."). Husband named Wife as the Managing Director for each LLC, except C.H., but retained for himself, in the operating agreements, the authority to remove the Managing Director in his sole discretion (Exhibits 87, 88, 89, 90). Wife did not receive a salary for her purported work as Managing Director. Husband also had Wife appoint him as the Investment Advisor for each of the LLCs (12/2/22 Tr. 41). In this capacity, Husband has the ability to buy, sell, and invest the assets as he chooses and has consistently done so (Exhibits 87, 88, 89, 90). He does not receive a salary for his work as Investment Advisor.
However, because Wife could not act as the Trustee of the Trusts and, at the same time, the Managing Director of the LLCs owned by the Trusts, Husband removed her as Trustee before appointing her as Managing Director (Exhibits 63, 83-86). Wife was not consulted or involved in the creation of any of the LLCs, did not know what her duties and responsibilities as Managing Director were, and was not advised to seek independent counsel with respect to her removal as Trustee and appointment as Managing Director (10/13/22 Tr. 79; 12/2/22 Tr. 41, answering questions as to how Wife signed the LLC operating agreements: "R. asked me to sign it, and I signed it"). She testified, credibly and consistently, that she trusted Husband's representations that, notwithstanding these changes, her interest in the marital assets were protected.
In Wife's place, Husband appointed her sister, M.S., as Trustee (Exhibit 49). Husband acknowledged that he appointed M.S, who had experience in the financial sector, to provide Wife with a sense of security.
M.B. Holdings, LLC On May 6, 2004, Husband, with the assistance of his attorney, formed M.B. (Exhibits 50, 83) and appointed Wife as Managing Director, who appointed him Investment Advisor (Exhibits 50, 87).
Husband initially funded M.B. with marital assets totaling $52,764,747 in cash, money market funds, marketable securities, and other investments (Exhibit 50). Over time, he funded M.B. with additional marital assets, including the parties' interests in the other LLCs. As of trial (and as more fully detailed below), M.B. functions as the parent company to: (a) A.D., which owns the parties' grand 7.5 waterfront estate on Shelter Island in the Hamptons, known as Shorewood Court; (b) P.A., which owns the parties' investment real estate on Shelter Island [*8]worth $22 million; (c) C.H., which owns ETC; and (d) H.H., which owns the [Upstate] Home.
As of December 31, 2004, the GST owned 83% of M.B., Husband owned 10%, the Family Trust owned 1.4%, and Wife owned 5% (2/24/23 Tr. 76).
Over time, Husband transferred the parties' ownership interest in M.B. into the GST, which, by 2012, owned 97.6% of M.B. with the Family Trust owning 1.4% and Husband owning 1% — Husband had transferred all of Wife's 5% interest to the GST (2/24/23 Tr. 76). By the time of trial, the GST owned 100% of M.B. (Exhibit 50). Each party included assets held by M.B. on their personal sworn statements of net worth (Exhibits 9; 10A).
In April 2018, Husband valued M.B. at $109,395,848.00 (Exhibit 65).
A.D., LLC On June 28, 2006, Husband formed A.D., which, two years later, purchased Shorewood Court for $8 million. As with M.B., Wife was appointed Managing Director and Husband named Investment Advisor (Exhibits 84, 88; 12/2/22 Tr. 41).
According to Wife, Husband admired Shorewood Court since he was a "young boy" (10/13/22 Tr. 94). The parties were living in Geneva at the time the property came up for sale and Wife signed the purchase documents on the table at the family's home in Geneva; she did not know where the purchase money came from and presumed each party had a 50/50 interest in the property (10/13/22 Tr. 94-95). The parties extensively renovated the property: they moved the dilapidated 1800s home from one side of the property to the other (which became the guest house) and built a new 7,000 square foot home around a pre-existing tower (the main home). The main home is "spectacular"; there is an infrared sauna, telescoping windows, a three-car garage with a gym, two bedrooms, two bathrooms, and a laundry on the second floor (10/13/22 Tr. 98-99). There is a boat house and tennis court, and a pavilion on the property (Exhibits 20, 24). In 2010, Husband and the parties' daughters built an 8x10 vegetable garden on the property as a gift to Wife, who spent time cultivating and tending the garden with her daughters (10/13/22 Tr. 107). It became the family summer home (10/13/22 Tr. at 95: "I mean, that was our Hamptons home that we were going to invest in for our family forever."; Exhibit 65: Husband describing Shorewood Court as "[o]ur Shelter Island home").
In 2019, Shorewood Court appraised at $13 Million (Exhibit 20). It is currently owned 100% by M.B. (Exhibit 50).
Below Market Lease for Shorewood Court From 2008 — 2016, and consistent with the parties' unfettered use of marital assets in the Trusts, the family lived in and utilized Shorewood Court during the summer and on weekends and holidays during the year rent-free, without a lease or other written agreement (Exhibit 50). In 2016, for estate planning purposes only, Husband caused the parties to enter into a formal lease to rent the entire property from A.D. for $12,000 per month (Exhibit 33).
Husband alone — and not Wife as Managing Director or M.S. as Trustee — created the lease and set the rent. He calculated the monthly rent based upon a letter from a broker opining that Shorewood Court would have yearly rent of $375,000 and summer rent of $275,000 (Exhibit 115). Notwithstanding the family's exclusive use and occupancy of Shorewood Court year-round, Husband calculated rent at $12,000 per month based upon the summer rate, with a five percent increase for use during the remainder of the year, and then applied a 50% discount because the children, who are the beneficiaries of the Trust that owns the property, use the and enjoy the property (Exhibit 115). The lease requires the landlord, A.D., to pay utilities (Exhibit 33), and the GST pays the cost of the caretaker and ground maintenance, all of which amounts to about $57,000 per year or $4,750 per month.
At trial, Elise Prado, one of Wife's real estate experts, testified credibly that Husband's methodology did not result in a fair market value rent for Shorewood Court. The Court credits Ms. Prado's testimony that because the lease is a "non-arms-length transaction . . . he can make any number he wants because he is signing his own lease" (6/14/23 Tr. 24). As reflected in Ms. Prado's rent studies (Exhibits 40, 41) — which were unrefuted by Husband — the combined rent for the two residences — the main home and the guest house — at Shorewood Court should be $54,166 per month (id.).
Mr. McCabe testified credibly that he advises his clients to set the rent of trust property at the middle-to-high end of a fair market value assessment provided by a real estate professional (4/15/204 Tr. 217). Husband did not follow the advice of his attorney in setting Shorewood Court rent, which, based on Mr. Prado's opinion, would be $27,000 per month or more (at least half of $54,000), not $12,000.
C.H. LLC In or about 2011, Husband acquired an interest in Faith Shares, an Oklahoma financial services firm, and after a series of transactions and buy-outs, the entity known as ETC remains as the business. C.H. is the "vehicle of ownership for a majority interest in [ETC]" (Exhibit 65; 2/24/23 Tr. 98, 122, 131). Ownership of C.H. is as follows: as to preferred shares, the GST owns 99% and Husband's Revocable Trust owns 1%; as to common shares, the GST and Husband's Revocable Trust combined own 80% and an unrelated individual owns the remaining 20%. In addition, Husband is C.H.'s Managing Director (2/24/23 Tr. 128).
ETC issues, manages, and markets electronically traded funds ("ETFs"), a lucrative field with which Husband had experience at SLK. ETC has in excess of 24 employees and offices in Oklahoma and midtown Manhattan, where it pays monthly rent in excess of $22,000. In addition, ETC pays the expenses of Husband's office maintained in one the marital apartments (Apartment 2) at Central Park West in Manhattan. In 2018, ETC's CEO received a salary of $230,000 plus a bonus of $75,000 (6/24/23 Tr. 108-109).
Husband, however, does not, by his own choice, draw a salary from ETC (4/16/204 Tr. 263). Yet, he remains actively engaged in its management and operations. He sits on the Executive Committee that manages ETC, is on the Board of Trustees — comprised of people he proudly recruited and hired, having worked with them at SLK and Goldman Sachs (Exhibit 65) — and serves as the liaison between the Committee and the Board. He was present to ring the bell in the New York Stock Exchange when it began trading. In addition, as Investment Advisor of C.H., which owns at least two thirds of ETC, Husband is able to exert considerable control over it. Indeed, at trial, Husband proudly testified that "I was one of three founders of [ETC]. I am an equity owner in it" (4/16/24 Tr. 260).
As of 2018, ETC's platform was trading $5.5 Billion in assets and had net profits of $704,000 on revenue of $3.3 million, which represented a 57% year-over-year gain (Exhibit 65). Husband believed in the tremendous financial potential of ETC:
We are making strides toward what I perceive as the holy grail of business building, establishing recurring fee based revenue. Notably, our largest client, ROBO Global, with $2.3 billion in assets, recently signed a 10 year agreement with ETC as compared to the typical 3 year term. (id.)
As of April 2018, the appraised value of C.H.'s interest in ETC was $3,000,000 (Exhibit 19).
P.A. LLC On October 27, 2014, Husband formed P.A. for the purpose of acquiring 26 acres [*9]of waterfront property on Shelter Island located at 64 Burns Road (Exhibit 50). With a $15 million purchase price, he intended to divide the property into subplots for development and sale, with two lots for "family and friends" (Exhibit 65). As of June 30, 2019, P.A. consisted of seven vacant plots valued at $21,230,000 (Exhibit 21). As with M.B. and A.D., Wife was Managing Director and Husband Investment Advisor (Exhibits 86, 90).
M.B. owned 100% of P.A. at all times since its formation. However, Husband did not seek input from Wife, the Managing Director of M.B., before directing Mr. McCabe to create P.A..
Husband "was very involved" in obtaining required approvals for the plot division, including those needed for demolition, and controlled the development process. He made decisions about the property based upon his own personal interest in conservation and not based on purely financial considerations. Husband decided to divide the property into five parcels instead of the allowable 21 parcels, which, he testified "had the effect of reducing the development that would take place on a crucial watershed . . . So, it was really another way to articulate conservation values without actually using the mechanism of a conservation easement" (4/16/24 Tr. 287-88).
During the marriage, the parties used the P.A. property as their own: they stored vehicles and boats, entertained at the community center, and used the dock (10/13/22 Tr. 139). Indeed, both parties included P.A. as a personal asset in their respective Net Worth Statements (Exhibits 9, 10A).
As of the time of trial, Husband sold three of five of the P.A. lots for $3.3 Million, $3.775 Million, and $1.995 million, respectively, without notice to, or consent of, Wife or court approval (2/24/23 Tr. 23).
H.H. LLC On March 16, 2016, Husband formed H.H., which took title to the [Upstate] Home (Exhibit 85), and then transferred H.H. into the GST in exchange for $935,000 (Exhibit 50). Consistent with the LLC structure, Husband appointed Wife as the Managing Director of H.H., and he became the Investment Advisor (Exhibits 85, 89). 
In 2019, the property was appraised at $1,830,000 (Exhibit 42), two times the value of its transfer price to the GST.
Below Market Lease for the [Upstate] Home Notwithstanding the family's use of the [Upstate] Home throughout the marriage, rent-free and without a lease, in 2016, Husband — not the Trustee or Wife as Managing Director — drafted a formal lease pursuant to which the parties rented the home from H.H. for $3,000 per month (Exhibit 34). According to Husband, the lease was for estate planning only and did not impact, in any way, the parties' continued use and enjoyment of the property. Indeed, both parties included the property on their net worth statements and Husband identified it as a personal residence (Exhibits 9, 10A).
Like the Shorewood Court lease, the [Upstate] Home lease contained an under-market rent calculated by Husband and required the LLC landlord to pay utilities (Exhibit 34). Husband based the rent upon listings that he found on VRBO and Air B&B, which set rates at $200 per night, albeit for smaller homes (Exhibit 116). He then multiplied $1,000 by 36 days per year, the amount of time the family averaged at the home, and set the rent at $36,000 per year or $3,000 per month (Exhibit 34).
Jeffrey Robinson, Wife's other real estate expert, issued a report opining that the fair market monthly rent for the [Upstate] Home is $11,400 (Exhibit 42). He testified credibly about his methodology, corrected an error in his report and revised his finding that the fair market rent [*10]is $10,657 per month. Mr. Robinson described the property in detail, noting that he had "never seen anything like it. It is very nice" (3/2/23 Tr. 22). The [Upstate] Home is 200-acres with a 4,914-square-foot five-bedroom home that underwent substantial renovations and upgrades during the marriage. The home has a spa, wet bar, hot tub, four-car detached garage, 1500-square-foot caretaker's residence, and a 6,765-square-foot two-story barn. According to Mr. Robinson, "[i]t appeared to me that no expense had been spared in constructing the structure. It is quite nice" (3/2/23 Tr. 22).
In Mr. Robinson's opinion — which Husband failed to refute — monthly rent of $3,000 is "far from realistic" for a "property of this magnitude" (3/2/23 Tr. 28, 29-31). In addition, a market lease would require the tenant, not the landlord, to pay heating, electricity, plowing the driveway, and cutting the lawn. Consequently, Husband appears again not to have followed the advice of Mr. McCabe to set rent of this trust property at the mid to high end of $10,657 — i.e., at least $5,300 or more.
The Marital GST Lifestyle: 2001 - 2018
As would be expected, the parties' standard of living, post buy-out, became much more luxurious; the family neither needed nor wanted for anything. As noted in detail above, they purchased additional real estate, collectively valued at over $40 million. They hired a bespoke travel agent and traveled extensively by first class across the world: Morocco, Turkey, Greece, Rome, Sicily, South Africa. They hosted family during these vacations, some of which cost upwards of $200,000. They lived abroad for several years. They acquired various pieces of art (10/13/22 Tr. 188-119). During this time, three of their daughters were born [].
Notably, when describing the parties' lifestyle of extreme wealth, Wife did so humbly and acknowledged, several times, that they were fortunate ("we were lucky" [10/2/22 Tr. 57]). Husband presented as proud and precious over the family wealth and evasive and annoyed when questioned about his control over it.
In addition to the various Trust properties, in 2001, the parties purchased a one-bedroom apartment on the second floor of 353 Central Park West for $495,000 in cash, which appraised at $1.6 million in August of 2019 (Exhibit 18). Wife's mother resided in that apartment until 2004, after which the parties used it on their return trips from Europe. This apartment is not owned by the Trust, but its expenses are paid by it.
According to Wife, after Husband retired from Goldman Sachs in 2002, he did not want to be a stay-at-home dad and was hesitant to stay in New York because of the non-compete agreement he entered into with Goldman Sachs at the end of his tenure. Husband's plan was for the family to live in Chamonix for the fall/winters, then Paris for the springtime, then south to Saint Tropez (10/13/22 Tr. 60). The family actually did live in Europe for several years between 2002 and 2008 — first in Barcelona, Spain then in Chamonix, France, and finally in Geneva, Switzerland — freely traveling back and forth to New York for the summers and holidays and as needed. Wife arranged for many of these moves, finding suitable homes and ensuring they were properly furnished and appointed. When they returned to New York from Europe, the parties would use the second-floor apartment on Central Park West or stay in a summer rental home in South Hampton, or in the [Upstate] Home (10/13/22 Tr. passim).
The parties also engaged in several luxury and high-end activities, such as helicopter skiing, and became avid rock climbers. On one such heli-skiing adventure in February 2004, Husband had a terrible accident and sustained several serious injuries, including an unattached knee, broken hand and clavicle, requiring surgeries in France and New York. Wife took Husband [*11]to his doctor and therapists' appointments, nursed him back together, and walked with him on his long journey of recovery (10/13/22 Tr. 70-72).
All the while, Wife was a full-time mother, arranging for the children's various schools in the various countries, caring for each of their unique needs, including education and medical, and scheduling and attending their various activities. She learned French and tried to build a community in Chamonix. Although she had help, she took care of the homes in which the parties frequently hosted family and friends and cooked every night. According to Wife, there was a "full calendar" of guests coming to visit the family (10/13/22 Tr. 71). In addition, as the family grew and through 2004, Wife continued to work outside of the home but took a job in the non-profit sector (for a reduced salary of $26,000 per year) which gave her flexibility to be primary caretaker of the children. She was hesitant to move to Europe as it would make work difficult if not impossible. However, Wife acquiesced to Husband's request that she give up her career in 2004 ("I wanted to go back to work, I loved what I did" [10/2/22 Tr. 72]). She has not been gainfully employed outside of the home since that time. 
The parties returned to New York in 2008 and moved back into the four-bedroom apartment on Central Park West. They soon outgrew the apartment — with the birth of [their youngest daughter] in 2009, the home housed four children, two adults, and their live-in help. In 2010, the parties purchased Apartment 14A at 1175 Park Avenue in Manhattan ("the Park Avenue Home") for $8 million. The home is 4,000 square feet, four-bedroom, large kitchen, laundry room, maid's room, generous living room and library, with an elevator that opens into the apartment. The apartment underwent renovations and improvements before the family moved in, sometime in 2011/2012 (10/13/22 Tr. 124-126). The appraised value of the Park Avenue Home at trial was $11,600,000 (Exhibit 16). However, in or about April 2025, the parties entered into a contract of sale for the Park Avenue Home, with a sales price of $9,850,000, and the Court So-Ordered the parties' stipulation for such sale. At the time of this writing, the closing has not taken place and the anticipated net sales proceeds are $9.4 million. The Park Avenue Home is not owned by the GST.
From 2002 through the time of trial, Husband paid all of the family expenses and managed all of the parties' assets and investments in his role as Investment Advisor of the various LLCs. He had an office with ETC on Madison Avenue and maintained offices at Apartment 2 in Central Park West and at Shorewood Court. Wife was not familiar with the various accounts and types of investments owned by the parties, did not know how much everything cost or from which source the money came to buy assets (10/13/22 Tr. 20, 44, 85-86, 136, 138). She was busy raising the parties' four daughters and taking care of their various homes and trusted Husband's representations that her interests were protected. Husband told Wife that the family was living off the Goldman Sachs buy-out money and he would tell her about his ideas for investments, including acquiring real estate. He told her that Mr. McCabe was helping and advising him on the Trusts, but she did not see the Trust or LLC documents until she was asked to sign them. For instance, Wife first heard of M.B. in the spring of 2004 when Husband asked her opinion about the name (10/13/22 Tr. 74). When the family was in New York that summer, she and Husband went to Mr. McCabe's office to sign some more estate planning documents; she was assured that her interests in the marital assets were protected, but was not provided with the documents before she was asked to sign them and she did not have independent legal counsel prior to or at the transaction. She recalled receiving quarterly and annual reports for the LLCs from Husband (12/2/22 Tr. 42). Notably, however, the record is [*12]devoid of meeting minutes of other corporate documents showing Wife's active, affirmative involvement in the LLCs, as Managing Director or otherwise. As to the parties' tax returns, Husband would have the "documents laid out on the kitchen table with tags as to where to sign. He would flip the pages as I would sign, and then I would leave and go to pick up. That was, kind of, the routine" (12/2/22 Tr. 39).
As outlined in detail above, at times between 2001 and 2018, Husband gifted marital assets directly to the GST. He also created LLCs that used marital assets to purchase real property and other assets; these LLCs are held by M.B., which is in turn owned 100% by the GST. By end of 2004, Husband transferred approximately $83 million of marital assets into the GST. Over the following years, he formed the LLCs through which he used other marital funds to purchase and improve additional assets, including, inter alia, Shorewood Court, the Shelter Island real estate investment property and ETC.
The parties filed joint tax returns for each year from 1994 through 2018 and used their lifetime gift exemptions — a non-renewable asset — for every transfer of martial assets into the GST. They also paid income taxes on the GST income, depleting their marital assets in favor of the GST assets.
By his own admission, as of April 2018, M.B. was valued in excess of $109,000,000 (Exhibit 65). Husband, as Investment Advisor, actively managed and controlled assets owned by M.B. and the other LLCs (Exhibit 87; 2/24/23 Tr. 102-103). He acknowledged as much at trial in April 2024, when he testified that he has "been looking to step back from the financial markets, and my activities. I'm working toward retirement. . . and think[ing] about a succession plan for the management of these assets" (4/16/24 Tr. 257). 
Throughout the marriage, the parties had a joint bank account into which Husband would deposit money for Wife to pay certain small, ancillary family expenses. Husband paid the larger expenses for the parties' homes and other investments. The undisputed proof at trial established that the family expenses were (and continue to be) funded by the marital assets in the Trusts, either directly or indirectly by way of loans taken by Husband, which were approved by the Trustee, his close friend T.S.
Indeed, after his retirement in 2002, the Trust assets must have paid the family expenses because Husband was not working and, thus, earning no outside income. The family resided, rent free, in Sherwood Court and the [Upstate] Home for years and then enjoyed (and Husband continues to enjoy) a substantially below market rent, with the Trust paying the expenses for the properties. The GST also pays the expenses of Apartment 2 at Central Park West, which Husband uses as an office, as well as for the family cars, auto-insurance, garage, and related expenses; family health and dental insurance; and cellphones. At the trial, Wife testified that the maintenance and carrying costs for the Park Avenue Home were paid, but she did not know how they were being paid (10/13/22 Tr. 55).
All was not perfect, of course; it never is and money is not a guaranty of a successful or sustainable marriage. The parties intermittently had difficulties around parenting issues for their younger daughters — [the youngest daughter], specifically, who had medical and emotional issues. In 2001, Husband accused Wife of adultery. He was somewhat correct: Wife, admittedly, had an emotional (not physical) affair with another man at the time. Wife also suffers from alcohol abuse disorder for which she has and continues to receive treatment. Husband, admittedly, started seeing another woman. By the end of the marriage, each lost trust in the other. Wife wanted to work it out and her hope in that regard was restored after she helped nurse [*13]Husband back from his cancer fight in 2015-2016. Husband, however, apparently did not want to work on the marriage and moved out of the marital home on Park Avenue in February 2018, removing substantial marital assets such as artwork in the doing (10/13/22 Tr. 148-150).
Wife commenced this action on May 16, 2018.
The parties resolved their custody and parental access issues by the Custody Agreements, pursuant to which they have joint legal custody with equal shared parental access schedule and substance abuse monitoring for Wife (Exhibits 4, 5). As noted above, [the oldest two daughters] are emancipated, [the youngest two daughters] are not. [The third daughter] attends boarding school in Sun Valley, Idaho, where Husband relocated in 2024. At the time of the trial, [the youngest daughter] attended school in Manhattan and spent 50% of her time with Wife. Husband, over Wife's vigorous objection, sought to enroll [the youngest daughter] in school in Sun Valley, which would effectively destroy Wife's 50% parenting time.[FN3]

Post Commencement: The Removal of Wife from the Trusts
The Decanting of the Family Trust and GST, and Creation of New Trusts
When the parties' initially split, Wife continued to reside in the Park Avenue Home. She also used the guest house at Shorewood Court, and the parties each separately used the [Upstate] Home in order to co-parent.
Everything changed in Wife's life about a year after she filed for divorce. In June 2019, Husband commenced a systematic effort to totally remove her from the Trusts, cut her off from the marital assets and out of the family wealth, and evict her from her homes without court approval or any notice. Among other things, he cut her out of decisions about the parties' Foundation (12/2/22 Tr. at 31). At trial, Wife was visibly devasted by Husband's conduct following commencement of this divorce (10/13/22 Tr.: "Because I trusted R. and it never in a million years did I ever imagine that I would be here today in this position").
Removal of Wife from the Trusts
On June 6, 2019, Husband removed M.S. as Trustee of the Trusts and replaced her with his close friend, T.S. (Exhibit 63). Simultaneously, he removed Wife as Managing Director of each of the LLCs, to wit: M.B., A.D., P.A., and H.H., and replaced her with his friend, B.H., and then his own sister N.O. (Exhibits 51A-53, 62). According to Husband, the removal was required because Wife and M.S. refused to direct distributions from the LLC to pay the GST's taxes (2/24/23 Tr. 151). According to Wife, she no longer trusted Husband and she was not willing to rubberstamp his actions as she had done throughout the marriage (10/13/22 Tr. 140).
The Court rejects, as incredible, Husband's purported excuse for removing Wife and M.S. from their roles. Husband admitted that the GST itself could sell assets to pay its taxes and had actually done so in the previous three years, and that, other than a financial penalty, the GST would not have suffered any negative consequences for delay in payment of the taxes (4/16/24 Tr. 383-384).
Husband's actions in this regard belie his claim that he has no control over the Trusts or their assets. The very structure of the Trusts and the LLCs provide him with the sole power to remove the Trustees and the Managing Directors, and his authority as LLC Investment Advisor permits him to sell, transfer, and trade the assets. He has consistently exercised these powers.
Therefore, the Court finds as a fact that Husband's explanation for his removal of M.S. and Wife is pretext for his true motive, which was to replace Wife and M.S. with people who would follow his mandate, maintain his control over the Trust assets, cut Wife out of the family's wealth and strip her of any influence over the marital assets in the Trusts while he continued — and continues — to fully utilize and enjoy the benefits of those assets.
The Decanting of the Family Trust into the GST
On November 25, 2019, T.S. decanted the assets in the Family Trust into the GST (Exhibit 56). Husband admitted that he asked T.S. to consider taking this action but angrily denied that he directed him to do so. The Family Trust required the Trustee to distribute to each of the four daughters their fair share of the Trust when they reach age 30 (Exhibit 46). However, the parties' daughters do not share in the assets of the GST, which remain in trust for their own beneficiaries (Exhibit 45). Thus, by decanting assets from the Family Trust into the GST, Husband has potentially secured financial influence and power over the children indefinitely.
Wife had no notice of, and did not consent to, the decanting of the Family Trust into the GST. The Court did not approve the decanting, which Husband conveniently did not seek.
Husband did not have the power to consent to the decanting on behalf of his minor daughters [] —— given the clear mandate of the Custody Agreements that require the parties to confer about major parenting decisions (Exhibits 4, 5), but he did anyway (Exhibit 59). He also did not inform, or seek the consent of, Tara Diamond, Esq., the attorney appointed by the Court for the youngest daughters (Exhibit 105), prior to consenting to the transaction on their behalf. As noted, by decanting the Family Trust, the daughters lost their right to receive assets in the Family Trust when they turned 30. [The oldest daughter], then 22 years old, consented based on Husband's input alone without any consultation with counsel or Wife (Exhibit 61).
Similarly, Husband did not have the authority to consent to the decanting of the Family Trust assets into the GST on behalf of the parties' charitable foundation, a marital asset, without notice to and the consent of Wife (Exhibit 64). As of November 2019, the Foundation held $2,264,626.10 in its bank account, which, since this action commenced, Husband has dominated and controlled (Exhibit 82).
The Renunciation of Grantor Status for the GST
On that same November 25, 2019 day, and again without notice to or consent from Wife, and without leave of Court, Husband executed a Renunciation of Power of Substitution Under Section 675(4) of the Internal Revenue Code (the "Renunciation of Grantor Status") for the GST (Exhibit 57). By executing the Renunciation of Grantor Status, Husband ceased to be the owner of the assets held in the GST for the purpose of applicable income tax law, and the GST then became a separate and self-contained taxable entity with assets worth in excess of $109 million, which is required to pay taxes on the income generated by the assets. The parties were no longer required to pay taxes on the GST income, although Husband continued (and continues) to maintain control over and enjoy the benefit of the GST assets (4/16/24 Tr. 361).
The GST 2020 tax return shows reported income of $2.3 Million, and its 2021 return shows reported income of $4,941,806 (Exhibits 165, 166).
The Mid-Trial Transfer of the GST to 2 New Delaware GSTs
In November 2023, right in the middle of the financial trial, and without any notice to Wife or the Court, Husband caused the GST to be decanted into two new GSTs formed in Delaware: (a) the R.H. 2023 GST Property Trust (the "Property Trust"), which holds all assets that have a nexus to New York, including M.B. and the LLCs it owns for which Husband [*14]remains the Investment Advisor; and (b) the R.H. 2023 GST Investment Trust (the "Investment Trust"), which holds marketable securities and cash but for which Husband is not the Investment Advisor (Exhibit 164).
When asked by the Court during trial why he did not give any notice to Wife or the Court of this major transaction, Husband blithely answered that he "had no obligation" to do so (4/16/24 Tr. 303-04).
The Court does not credit Husband's testimony that T.S., as Trustee of the GST, "made the independent decision to transfer [the GST] assets into the new Trusts" (4/16/24 Tr. 258). First, Husband testified that he made the change for tax purposes because he moved from New York to Idaho and that he created the new trusts (4/16/24 Tr. 336, in answer to the Court's question "I created the trusts") — two statements which undermine any finding that T.S. made this monumental financial decision independently and without any influence by Husband. Second, T.S. did not testify at trial to corroborate or support Husband's testimony about any of the decisions he purportedly made of his own volition and any actions he took in his capacity as Trustee. T.S.'s absence from the trial was particularly notable given Husband's testimony that he would "probably love" to testify (3/2/23 Tr. 88- 89, 154).
According to Husband, the Property Trust and Investment Trust contain the same assets and same beneficiaries as the GST, and did not change anything for the beneficiaries. However, Husband's testimony on this point was flatly contradicted by Mr. McCabe, who testified that "[t]here is no rule against perpetuities, in Delaware, so, when you create a GST Trust, in Delaware, they go on forever" (4/15/24 Tr. 2). In other words, the assets may not necessarily be fully distributed to the beneficiaries, which Husband testified was his actual intent: "I would like to see the assets accumulate for the benefit of these children, and, their children, and, their children, you know" (4/16/24 Tr. 283).
The Property Trust provides Husband with more power than he had under the GST. He is an Investment Advisor for the Property Trust, and as such he has "broad, uncontrolled discretion that is not subject to review except for willful neglect, willful misconduct or bad faith" and the "Trustees and the Administrative Trustee shall not have any duty or liability for monitoring the performance of an investment directed by the Investment Advisor" (Exhibit 164 at 2 ¶ A, 47 ¶ C(1)). In addition, he can also direct the Trustees with respect to assets within the trusts:
Each Investment Advisor shall have the authority to direct the Trustees with respect to all powers relating to the acquisition, disposition, retention, exchange, change in character, lending, borrowing, pledging, mortgaging, managing, voting, leasing, granting of options with respect to, insuring, abandoning, or in any other way relating to the investment or management of the trust estate.
(Exhibit 164 at 2 ¶ A, 47 ¶ C(20). He also has the ability to remove and replace the Trustee of the new trusts.
Husband is not the Investment Advisor of the Investment Trust, the assets of which are far less substantial than the Property Trust. A financial institution is the Investment Advisor for the Investment Trust, and his emancipated daughters are developing their own relationships with the representatives of that institution.
Post-Commencement: Other Unauthorized Transfers and Bad Faith Conduct
Transfer of All of M.B. to GST
As of May 2018, the parties owned a share of M.B. in their own names, outside of the GST. In November 2019, without Court approval or Wife's knowledge and consent, Husband [*15]unilaterally transferred the entirety of M.B. into the GST.
Unauthorized Post-Commencement Distributions
Intermittently throughout this litigation, Husband made distributions of marital assets to himself and Wife, without leave of court and, indeed, despite court order denying his request to divide marital assets pendente lite (Exhibits 6, 7, 66). Wife objected to many of the distributions, to no end; Husband made them anyway.
As of October 17, 2022, he distributed $21,800,000 in marital assets — $10,950,000 to himself and $10,850,000 to Wife (Exhibit 66) — without any accounting as to the non-trust assets or investments that funded those distributions. Husband also did not demonstrate how the distributions were required to fund legitimate household or living expenses for either party. As far as the record shows, the post-commencement family expenses were funded by the GST. Husband's testimony that he made the distributions of non-trust marital assets in order to avoid claims that he mishandled investments belonging Wife, is not credible — indeed, it flies in the face of his financial expertise underpinning his status as "Investment Advisor" for the LLCs with assets of over $109 million and an "Equity Partner" of ETC, which manages $5.5 billion in trades. More pretext.
Unauthorized Use of Marital Assets
In 2024, without court approval or consent of Wife, Husband closed on the purchase of a home in Sun Valley, Idaho (the "Sun Valley Home") for $4,150,000 and has formally relocated there (Exhibits 117, 169, 170). He did not demonstrate that he used separate property to purchase the Sun Valley Home, or his own post-commencement earnings from employment.
Also without court approval, Husband purchased a boat for $185,000 in 2022 (the "2022 Boat") with funds from his revocable trust account, a marital asset (Exhibit 154).
Wife's Wrongful Eviction from Shorewood Court and the Upstate Home
Right at the beginning of the pandemic, on March 9, 2020, T.S., as Trustee, notified the parties that their joint lease for Shorewood Court would be terminated effective June 12, 2020 (Exhibit 35). At that time, the parties and their children were living on the property fulltime: Husband principally occupying the main house and Wife primarily residing in the guest house.
Husband admitted that he knew about the lease termination in advance but denied directing T.S. to effectuate the termination. His testimony that "[i]t wasn't very natural for the two of us to be together on the same property" and that being on the same property "would be very uncomfortable" (3/2/23 Tr. 160), coupled with his other attempts to lock Wife out of the homes (more on that below) (Exhibits 6, 7), reveal that his denial is not credible.
T.S. immediately issued a new lease for Shorewood Court in Husband's name alone at a rent of $15,000 (Exhibit 37), which he then renewed in June 2021 for three years at the same rent (Exhibit 119). Husband did not refute Ms. Prado's rent study and testimony that the market rental rate for Shorewood Court is $54,166 per month (Exhibits 40, 41). The Trustee did not offer Wife a similar lease, in her own name, for any part of the Shorewood Court, although he could have — there are two homes on the 7.5-acre property. In order to enjoy her parenting time, Wife had to rent a three-bedroom, two-bathroom home in the Hamptons for $30,000 per month plus utilities while Husband enjoyed the 7-bedroom, main home on Shorewood Court (12/2/22 Tr. 127).
Also on March 9, 2020, T.S. terminated the parties' joint lease on the [Upstate] Home effective June 12, 2020 and, on June 13, 2020, entered into a new lease solely in Husband's name as tenant (Exhibit 36). Husband drafted the lease for himself, which sets rent of $3,000 per month, with the landlord covering utilities, and which the Trustee renewed for another three [*16]years commencing on June 13, 2021. Again, the Trustee did not offer Wife a similar lease, in her own name, for any of the remaining 329 days that Husband is not at the [Upstate] Home (as he is only there for 36 days out of the year).
On the other hand, Husband's use and enjoyment of the vast luxury accommodations at Shorewood Court and the [Upstate] Home, with their numerous amenities — including artworks, boats and other watercraft, tennis court, pool, saunas, and the like (Exhibits 22, 24-26) — has continued unabated and uninterrupted. He also continues to reap ongoing substantial monetary benefit by way of below market rent for each property and the Trust's payment of expenses for the properties and other family expenses.
Other Bad Faith Conduct
Husband did not just use the Trustee to evict Wife from the homes she helped bring to life. He also engaged in a campaign to erase her imprint and influence at the family homes and to hurt her. On several occasions at the [Upstate] Home and Shorewood — at least one of which occurred in front of [their youngest daughter] — without provocation, Husband angrily demanded that Wife "get of my house!" At the [Upstate] Home, he emptied Wife's closet of all of her clothing and left a picture of his new girlfriend in plain view (Exhibit 94). This incident led Wife to relapse for which she entered a rehabilitation facility from December 2021 — January 2022 (12/2/22 Tr. 125).
Husband removed Wife's name from Shorewood Court. He took down the "S/H" sign from the front of the property (Exhibit 38) and replaced it with a "H" sign (Exhibit 39), even though the children's last name is "S H." In February 2020, he changed the alarm code and took the keys out of their usual location, causing her break into her own home and then explain to the police that she was not an intruder (12/2/22 Tr. 78-83; 3/2/23 Tr. 129). He changed the locks on the guesthouse (Exhibit 43), and, in October 2021, he bulldozed and removed the vegetable garden that she and her daughters cultivated and loved (Exhibits 27, 28; 10/13/22 Tr. 108, 110-11; 3/2/23 Tr. 147).
Husband did not refute the ample proof of his post-commencement bad-faith conduct toward Wife.
Husband's Failure to Respond to
 Trial Subpoenas and Produce Material Witnesses
By trial subpoena, Wife sought the production of, inter alia, communications between Husband and T.S. and N.O. related to the Trusts, annual reports and financial reports, and other financial documents related to the Trusts and its purchase of property and payment of expenses, which were material to the core issues at trial (Exhibit 162). Husband failed to respond in full to the trial subpoena (Exhibit 163; 4/16/24 Tr. 299-303). Husband also did not offer T.S. as a witness to corroborate or support any part of his testimony as to the Trustee's alleged independent decisions and actions, and Husband's purported lack of control thereof — a fact worthy of repeated note.
Husband did not rebut Wife's proof at trial showing the appraised values of Shorewood Court and the [Upstate] Home and the reasonable market rent for those properties. He did not offer any proof as to value of ETC, or the value of C.H..
He also did not dispute Wife's proof of her substantial and significant contributions to the home and family life, and her role as primary caretaker of the children. He did not dispute his post-commencement bad faith conduct toward Wife.
The Trust and Non-Trust Assets
The competent admissible proof established the following as to the parties' assets, the [*17]total value of which amounts to $181,469,321:
Assets Outside the Trusts:                                                                                                     $70,243,473
Real Estate:

• 1175 Park Avenue, Unit 14A  
     New York, New York
 

$9,400,000 (expected net sales price)

• 353 Central Park West, Unit 8 
    New York, New York

$6,400,000 (Exhibit 17)

• 353 Central Park West, Unit 2 
     New York, New York

$1,600,000 (Exhibit 18)

• 671 2nd Avenue 
    Ketchum Idaho

$4,150,000 (Exhibits 169, 170)

Investment Accounts & Miscellaneous Financial Assets:

• Cevian Capital II

$3,176,222 (Exhibit 174)

• Drawbridge Funds

$12,993,894

ο Drawbridge Special Opportunities

$8,218,436 (Exhibit 173)

ο 2013 RCA Withheld Distribution

$197,427 (Exhibit 172)

ο 2109 RCA Withheld Distributions

$4,432,168 (Exhibit 172)

ο DBSO Escrow Fund

$145,863 (Exhibit 191)

• R.H. Revocable Trust 

$7,875,416

ο Acct. xxxxx:

$5,321,834 (Exhibit 67)

ο Acct. xxxxx: 

$540,129 (Exhibit 68)

ο Acct. xxxxx: 

$320,350 (Exhibit 70)

ο Acct. xxxxx: 

$21,909 (Exhibit 72)

ο Acct. xxxxx: 

$240,641(Exhibit 73)

ο Acct. xxxxx: 

$1,430,553 (Exhibit 199)

• R.H. IRA Rollover Account xxxxx

$1,132,917 (Exhibit 198)

• Post Commencement Distributions

$21,800,000 (Exhibit 66)

ο [*18]$10,950,000 to Husband

ο $10,850,000 to Wife

• The R.H. and C.S.

Charitable Foundation Account xxxxx

$1,530,024(Exhibit 82)

Miscellaneous Personal Property:

• 2022 Boat

$185,000 (Exhibit 154)

• Artwork 
 

$Unknown, to be valued

The GST

$111,225,848

• M.B.

$109,395,848

ο A.D.

ο P.A.

ο C.H.

• H.H. LLC

$1,830,000

The Court notes that some of the individual assets (real property, investment accounts, etc.) are valued as of date of commencement and some are valued post-commencement and closer to trial. In addition, some of the assets are active and some passive. In this regard, the investment accounts may have increased (or decreased) in value due to market forces. In addition, the value of some of the assets, such as Husband's Revocable Trust and the Foundation, may have been further reduced by his unauthorized use of funds in those accounts. As noted, Husband did not fully respond to the trial subpoena which would have revealed a more complete picture of the value of the Trust and non-trust assets.
The Parties' Equitable Distribution Requests
Wife asks the Court to include in its equitable distribution award the value of the assets in the Trusts and non-trust marital assets, amounting in all to $181,469,321, and award her 65% of that value, or $117,995,059.
Husband asks the Court to distribute only non-trust marital assets, amounting in all to $70,243,473, and award each party 50% of those non-trust assets.
The Parties' Earnings
The parties' earnings are and have always been greatly disparate: Husband earns millions each year and Wife, who was last gainfully employed in 2004 at a $26,000 annual salary, took a [*19]loss of over $30,000 on her yoga business in 2021.
Notwithstanding Husband's claimed "retirement" in 2002, he has recently identified his occupation as "Executive" (Exhibit 168) and earned substantial income each year from 2016 to 2022, as follows:

2016:  $2,462,538

(Exhibit 78)

2017:  $3,564,209

(Exhibit 78)

2018:  $6,718,301

(Exhibit 15)

2019: $2,760,300

(Exhibit 13)

2020:  $555,949

(Exhibit 12)

2021:  $2,563,404

(Exhibit 109)

2022:  $1,552,484

(Exhibit 168)

Importantly, the GST had income of $2.3 million in 2020 and $4,941,806 in 2021 (Exhibits 165, 166). Income presumptively generated by Husband's efforts as "Investor Advisor" of the LLCs and which presumptively funded the family expenses. Husband, however, does not draw a salary for his work as Investment Advisor.
Nor does he draw a salary at ETC, notwithstanding his work in managing its operations — work ostensibly similar to that for which he earned $2 million per year in 2000 — and the GST's payment of the expenses of his home office. Notably, the CEO of ETC received a salary of $230,000 plus a bonus of $75,000 in 2018 (6/24/23 Tr. 108-109).
Finally, Husband realized a tremendous financial boon by reason of the "sweetheart" leases for Shorewood Court and the [Upstate] Home. The collective estimated monthly value of the below market leases is $17,300: $15,000 per month for Shorewood Court ($27,000 rent [mid-range of $54,000 market rent] - $12,000 actual rent); and $2,300 per month for the [Upstate] Home ($5,300 rent [mid-range of $10,600 market rent] - $3,000 actual rent). He has enjoyed this economic benefit since June 2020 (for 63 months, through September 2025).
On the other hand, Wife reported a loss of $37,923 from teaching yoga and conducting sound meditation on her 2021 tax return (Exhibit 8; 2/24/23 Tr. 27). As far as the record shows, she also expended her lifetime gift exemption for the transfer of martial assets into the GST — a personal asset which is gone forever once used (2/24/23 Tr. 40-41).
Maintenance
Wife did not request, and Husband did not pay, any pendente lite maintenance, although her Statement of Net Worth showed $203,000 per month in living expenses. She seeks, however, an award of $2 million per year (or $166,666 per month) for a period of 15 years, retroactive to the May 16, 2018 date of commencement. Her request is based upon imputed income to Husband of $4.5 million and application of the statutory maintenance factors.
Husband denies that Wife has an inhibited earning capacity or ability to maintain [*20]meaningful employment and that her equitable distribution award will more than adequately meet her needs. In the alternative, he asks that the Court credit him with the $10,850,000 interim distributions he made to her toward any maintenance award.
Child Support
Wife did not request, and Husband did not pay, any pendente lite child support, even though he is the monied spouse and the parties share 50/50 custody. She seeks at trial $10,000 per month in child support, for the two unemancipated daughters — [] — retroactive to the commencement date, based upon $4.5 million of imputed income to Husband and the children's needs.
Attorneys' Fees and Expert Fees
Both parties seek an award of attorney's fees.
Wife submitted proof showing that she incurred $2,396,852.37 in attorney's fees, and $162,306.50 in expert fees (Exhibits 96-104, 107), and asks the Court to award her this sum from Husband.
Husband argues that Wife should be responsible for her own attorney's fees and asks that he be awarded $575,000 in attorney's fees (credited against her equitable distribution award) due to her changes in counsel, 11 motions, and "meritless claims."
CONCLUSIONS OF LAW
Equitable Distribution
The Marital Estate to be Distributed
The Domestic Relations Law contains a presumption in favor of marital property; indeed, it defines "marital property" as "all property acquired by either or both spouses during the marriage and before. . . the commencement of a matrimonial action, regardless of the form in which title is held" (DRL § 236 B [1] [c]). The term is broadly construed and "includes a 'wide range' of tangible and intangible interests" in order to "keep with the fundamental purpose of the Equitable Distribution Law—the recognition of marriage as an economic partnership" (Fields v Fields, 15 NY3d 158, 162 [2010]; Szypula v Szypula, 42 BY3d 620, 624 [2024] ["The Domestic Relations Law creates a statutory presumption that 'all property, unless clearly separate, is deemed marital property'"]; DeJesus v DeJesus, 90 NY2d 643, 647 [1997] ["The statute is sweeping and 'recognizes that spouses have an equitable claim to things of value arising out of the marital relationship'"]). On the other hand, separate property, which is an exception to marital property, is construed narrowly and the party claiming that property is separate has the burden of proof on the issue (Fields, 15 NY3d at 163; DeJesus, 90 NY2d at 652).
"Although the manner in which marital property is distributed falls within the discretion of the trial court, 'the initial determination of whether a particular asset is marital or separate property is a question of law, subject to plenary review on appeal'" (Fields at 161 [citing DeJesus at 647]).
Neither Wife nor Husband make any separate property claims. Rather, their sole dispute is whether the Court can, and should, include the value of the Trust assets in the marital estate for the purposes of fashioning an equitable distribution award. The issue is brought against a background of precedential authority, albeit scant, which on the surface seems to suggest that the Trusts are outside of the martial estate, the position advanced by Husband. However, the facts here are markedly distinguishable from the cases in which trust assets were excluded from equitable distribution. More importantly, the principles underpinning the Domestic Relations Law compel the court to answer the question in the affirmative on this record and include the [*21]value of the Trust assets in making its distributive award to Wife.
Families may choose to place marital assets into trusts to shelter them from estate taxes and to protect them for future generations (DRL § 236 B [3] [parties can enter into agreements which may include "(1) a contract to make a testamentary provision of any kind" and "(2) provision for ownership, division or distribution of . . .marital property"]). It is no secret that high wealth families utilize trusts as a vehicle to preserve wealth (Iris J. Goodwin, How The Rich Stay Rich: Using A Family Trust Company to Secure a Family Fortune, 40 SHLR 467 [2010]).
Notwithstanding this practice, the relevant authorities guiding the court's approach to equitable distribution of trust assets are quite few. A handful of cases reveal that courts will not divide irrevocable trusts that are set up during the marriage and funded with marital assets, provided the trust is created as a legitimate vehicle for gifting marital property to a third party (Oppenheim v Oppenheim, 168 AD3d 1085, 1086 [2d Dept 2019] [irrevocable family trust intended to benefit parties' children and their descendants outside of marital estate and not subject to distribution]; Perdios v Perdios, 135 AD3d 840, 841 [2d Dept 2016] [building owned by irrevocable family trust created during marriage not property subject to equitable distribution]), and "the parties are not trustees and have relinquished control over the trust assets" (Hofmann v Hofmann, 155 AD3d 442, 442 [1st Dept 2017] [wife voluntarily transferred marital home into irrevocable trust and was "fully aware of the specific terms of the trust"]; Markowitz v Markowitz, 146 AD3d 872 [2d Dept 2017] [insurance policy held in irrevocable trust, with neither party as trustee with power to transfer control of trust assets, should not have been included in distributive award]; R.S. v B.L., 151 AD3d 609 [1st Dept 2017] [property held by insurance trust, not marital estate, not subject to equitable distribution]).
However, other cases reveal that, consistent with the statute's purpose of honoring the parties' interest in marital property and economic partnership in the marriage (Mahoney-Buntzman v Buntzman, 12 NY3d 415 [2009]), the court will indeed exercise its broad discretion to consider the value of, and possibly even distribute, marital assets held in trusts, under certain circumstances. Thus, marital assets in a revocable trust will be distributed where one spouse retains control over the trust (see Galachiuk v Galachiuk, 262 AD2d 1026 [4th Dept 1999] [court properly considered trust into which husband deposited funds as he failed to show trust was irrevocable]; see also Wortman v Wortman, 11 AD3d 604 [2d Dept 2004] [trial court properly included in husband's distributive award cash surrender value of life insurance policies held in trust because wife, as trustee, could effectuate this aspect of award by transferring control and ownership of trust assets to husband]).
Assets held in trust will also be distributed where the trust is a "sham" and intended to defraud the other spouse or smuggle assets out of the marital estate (see Surasi v Surasi, 2001 NY Slip Op 40408(u), 2001 WL 1607927 [Sup Ct, Richmond County 2001] [family trust created by husband in New Jersey during divorce proceedings into which he placed marital assets including marital home "is a sham and a fraud upon this court created expressly with the intent to deny [wife's] claims to said martial property and to thwart the jurisdiction of this court to make a distributive award"]). Indeed, the Appellate Division, First Department recognized the critical need for parties to engage in "broad pretrial disclosures" addressing the spouses' respective "participation and knowledge" of trust terms, and the benefits one spouse may derive from the placements of assets into a trust, "if the court is to properly distribute the marital assets" (Trafelet v Trafelet, 150 AD3d 483, 485 [1st Dept 2017]).
Even where the trust is irrevocable and there is no proof of economic fault, the court may [*22]consider the value of the marital assets placed in such trust in formulating a distributive award, although it cannot direct distribution of those assets (Reichers v Reichers, 178 Misc 2d 170 [Sup Ct, Westchester County 1998] aff'd 267 AD2d 445 [2d Dept 1999] [wife, who will no longer be a beneficiary of family trust upon divorce of parties, awarded "one half the value of the marital assets" placed by husband in Cook Islands trust]; see also Torkin v Susac, 236 AD3d 1082 [2d Dept 2025] [trust containing marital property subject to equitable distribution]). Similarly, the placement of a martial home into a qualified personal residence trust (QPRT), a type of irrevocable trust (Black's Law Dictionary [12th ed 2024], Trust), does not necessarily remove the residence from its inclusion in a distributive award (Yerushalmi v Yerushalmi, 136 AD3d 812, 813 [2d Dept 2016] ["The fact that title had been transferred to the QPRT, allegedly for estate planning purposes, while the parties continued to reside at the marital residence, was, under the circumstances here, insufficient to rebut the presumption" that it constituted marital property subject to distribution]).
The principles apparent and applied in the foregoing cases are (1) marital property is sacrosanct, regardless of its form, title, or how maintained and the court will protect the parties' respective equitable interests therein (DRL § 236 B [1] [c]; Fields, 15 NY3d 158; Szypula, 42 NY3d 620; DeJesus, 90 NY2d 643; Galachiuk, 262 AD2d 1026; Wortman, 11 AD3d 604; Torkin, 236 AD3d 1082; Yerushalmi, 136 AD3d 812; Reichers, 178 Misc 2d 170 aff'd 267 AD2d 445); and (2) in furtherance of its mandate, the court must consider the parties' conduct vis-à-vis marital property held in trusts in determining whether it should be included in the marital estate (Trafalet, 150 AD3d 483; Oppenheim, 168 AD3d 1085; Surasi, 2001 NY Slip Op 40408[u]).
The natural application of these synthesized principles here compels the Court to consider the value of the marital assets in the Trusts in fashioning its equitable distribution award because: (1) the majority of the parties' assets are contained in the Trusts, they used those assets to fund and support their lifestyle, and Wife reasonably expected to enjoy the use and benefit of the Trust assets in the future; and (2) Husband never relinquished control over the Trust assets. This approach honors the parties' "economic decisions" to shelter their vast marital assets while using them to fund the marital lifestyle, and "equitably distribute[s] the assets" now that the marriage is at an end (Mahoney-Buntzman v Buntzman, 12 NY3d at 421). Indeed, this approach is required by the precedents on this record because "Equity treats that as done which ought to be done" (Benjamin N. Cardozo, The Nature of the Judicial Process 39 [1921]).
The ample, undisputed proof establishes that the majority of the marital assets were placed in the Trusts to protect the family's wealth for future generations while also funding every aspect of the family's present life. Husband's career, and the family homes, expenses and lifestyle were supported by, indeed, embedded in, the Trusts and Trust assets. Almost immediately after receipt of the Goldman Sachs buy-out, Husband transferred into the GST $83 of the $120 million of the cash and stock — nearly 70% of the parties' marital assets. Over time, he transferred the rest of the marital assets into the Trusts. On top of that, the parties added more of their marital assets. They used their valuable lifetime gift tax exemptions to reduce or defray the taxes on the transfers into the GST — a nonrenewable asset, lost once used. They received promissory notes at deep discounts to the value of the assets transferred to the GST, and then Husband forgave some of the debt due under the notes. The parties paid taxes on the income generated by the Trusts from their non-trust money. In exchange, the Trusts provided the family with breathtaking homes and an affluent lifestyle.
The Trusts employed — and continue to employ — Husband. As of April 2024, Husband [*23]was still actively managing the Trust assets. He is the Investment Advisor for M.B. and each of the LLCs owned by the M.B.. In that capacity, he has bought, sold, transferred, and invested Trust assets in his own discretion and without oversight. The GST owns C.H., which owns the majority of ETC, the company in which Husband is an equity partner and founder. Husband continues to manage ETC without a salary, notwithstanding the fact that in 2018 ETC traded $5.5 billion in assets and paid its CEO $230,000 and a $75,000 bonus. The GST owns P.A., which owns the Shelter Island investment property worth approximately $22 million. Husband is, in effect, the "unpaid" developer of that significant real estate investment, which the parties also used for personal benefit.
The Trusts pay expenses for the Shorewood Court and the [Upstate] Home; Apartment 2 at Central Park West (one of Husband's "offices"); the family cars, auto-insurance, garage, and related expenses; family health and dental insurance; and cellphones.
The Trusts own the parties' $13 million Sherwood Court summer compound and the [Upstate] Home — properties listed by each party as their residence on their respective Net Worth Statements, and which Husband acknowledged were the family homes. The family lived rent-free in these homes until 2016, and then at a well-below market rent, and the Trusts pay for the expenses of these properties. For this reason alone, the value of Shorewood Court and the [Upstate] Home should be included in the marital estate for distribution (Torkin, 236 AD3d 1082; Yerushalmi, 136 AD3d 812).
Wife agreed to place virtually all of the family wealth into trusts, and give up other martial assets to benefit the Trusts, because she understood it to be a "tax haven" that would not impede the parties' ability to use and enjoy their assets for their expenses and lifestyle, and the record amply supports this conclusion. The entire family, including Wife, directly benefitted from trust assets and the income generated therefrom on a day-to-day, year-to-year basis. Husband consistently assured Wife that Trusts were the source of the family's income and she blindly trusted him with the payment of bills and management of the assets. Indeed, the Trusts must have been the sole source of income as Husband "retired" in 2002 and has not drawn a salary from outside employment since then. As noted, he has worked exclusively as the Investment Advisor for M.B. and each of the LLCs in full-time capacity at his offices on Central Park West and at Shorewood Court. He had not yet given up active management of Trust assets in April of 2024 (4/16/24 Tr. 257: "I'm working toward retirement. . . and think[ing] about a succession plan for the management of these assets").
The family lived off the Trusts; the entire family life is structured around them. There is no proof to the contrary in the record. Husband's blanket denials that the Trusts paid family expenses and funded the family lifestyle lacked any credibility as contradicted by documentary proof and his own inconsistent testimony (see Silvers v Silvers, 197 AD3d 1195 [2d Dept 2021] [equitable distribution award upheld where husband's testimony on financial matters "was found to lack credibility"]; Winter v Winter, 50 AD3d 431 [2d Dept 2008] [same]; Wortman, 11 AD3d 606 [trial court found husband's "testimony regarding financial matters to be less than credible"]). Indeed, the Court can and does conclude that the Trusts paid all of the family expenses — including but not limited to those for the Park Avenue Home, ostensibly paid by Husband from Trust assets — given Husband's failure to fully respond to Wife's trial subpoena calling for documents on this very issue (see generally Schorr v Schorr, 46 AD3d 351 [1st Dept 2007] [husband "properly precluded from offering evidence at trial as to any financial issues because of his failure to timely comply with discovery requests concerning his businesses and to [*24]pay the fees of the expert appointed to value his business interests"]; Spector v Spector, 18 AD3d 380 [1st Dept 2005] [preclusion order proper as defendant failed and refused to provide documents properly demanded; "In its preclusion order, the court also properly found that moneys contained in defendant's trust were marital property."]).
On foregoing facts, the rule applied in Oppenheim — namely, that assets placed in an irrevocable trust are not subject to equitable distribution — does not control the outcome here. Unlike the husband in Oppenheim, Husband did not keep Wife informed about the management of the Trusts or LLCs and she did not share "equal footing" with Husband as to them. Rather, the overwhelming credible proof establishes that Husband alone decided when and how to create the LLCs, which marital assets to invest and when, which LLCs would hold which assets, and when the LLCs would be transferred to the Trusts. It further establishes that Husband told Wife about his ideas after the fact, sometimes on the ski lift or at dinner, or not at all. By way of example, Wife was not involved in the creation of the 2001 and 2002 GRATs and does not know what a GRAT is, even though they were used to transfer $10 million of marital assets into the Trusts. Nor did Husband consult with Wife before he created P.A., wholly owned by M.B., one of the LLCs of which she is Managing Director. The record is devoid of any meeting minutes or other corporate documents showing Wife's active involvement in running any aspect of any one of the LLCs. Rather, Wife relied, completely and unwaveringly, on her husband's assurances, went along with his ideas and signed papers where she was told to sign. Although she met with Mr. McCabe twice in 2001 when the Trusts were first formed, and in 2004 to sign documents related to her removal as Trustee and appointment as Managing Director of M.B., she never had her own legal counsel to advise and guide her on the impact of these changes. She was presented with the documents for the first time, each time, in Mr. McCabe's office. Wife did not know the details of any of the financial assets and transactions, real property purchases, or tax matters — she signed the Shorewood Court purchase documents on the dining room table in Geneva and signed tax returns at Husband's direction on the kitchen table at Central Park West before going to pick up the children. She blindly trusted her husband based upon his assurances that her interests were protected, while she raised the parties' four daughters and managed several households (compare Oppenheim, 168 AD3d 1085 [affirming trial court finding that wife failed to prove husband acted inequitably in the creation of family trust where husband "kept [wife] informed during the process of creating the family trust. . .the parties were on equal footing with respect to the financial aspects of the creation of the family trust. . .[wife] was fully informed of the source of funding of the family trust and its anticipated tax implications"]).
The facts in Perdios are too cursory to permit thorough analysis and comparison to the facts here. However, it appears from the decision that the subject building, owned 99% by the irrevocable family trust and 1% by the parties, was the only asset held in trust and not the major source of the parties' income as the husband had other business interests, of which the wife was awarded 20%, as well as her equitable share of the 1% interest in the building (Perdios v Perdios, 135 AD3d 840). The facts here are markedly different and compel the application of a different rule to a different result.
The record also established that the parties were trustees of the Trusts. Wife served as Trustee from 2001 until 2004, when Husband removed her so that she could take the title of Managing Director of the LLCs. T.S., Husband's close personal friend who served as Trustee from 2019 until 2023 (and, by the same token, M.S., the Trustee from 2004 - 2019), was nothing more than a straw-man who rubber stamped each of Husband's decisions. The record is replete [*25]with proof that Husband controlled T.S. as to his Trustee duties. Husband effected the eviction of Wife from Sherwood Court and the [Upstate] Home under T.S.'s name. Husband prepared the leases for Shorewood Court and the [Upstate] Home. He planned for and orchestrated the decanting of the Family Trust in the GST without court approval, or notice to and consent of Wife. He decanted the Trusts into the new Delaware Trust without court approval, or notice to and consent of Wife, and cavalierly testified that did not need to obtain such approval or consent.
The record lacks any credible proof of T.S.'s actual, active involvement in any of the financial and business transactions taken by Husband on behalf of trust assets. To the contrary, each decision, each trade, each purchase, each sale, of every trust asset was proudly taken by Husband without oversight, approval by anyone else but himself, and with impunity. Husband did not produce documents to the contrary nor did he offer the testimony of T.S. to support his claims. Husband, and not T.S., was the de facto Trustee. Unsurprisingly, under the Property Trust, Husband continues to exert power over the Trustee: he has "broad and uncontrolled discretion that is not subject to review" to direct the Trustee to take actions over trust assets, and has the ability to remove and replace the Trustee (Exhibit 164).
Husband never relinquished control over the trust assets, not even for a moment. As Investment Advisor, he is the primary decision maker for M.B., and each of the LLCs, as to assets purchased, transferred or exchanged, and the development of the real estate investment properties. He admitted that he continued to manage the assets of the Trusts as of April 2024. His power to remove and replace the Trustees and the LLC Managing Directors, coupled with his unfettered authority as Investment Advisor, and his consistent exercise of those powers, resulted in his total control of Trust assets. His own testimony throughout the trial made clear that, in his view, the financial and real property assets are his to control and Shorewood Court and the [Upstate] Home are his homes. Everyone else is a figurehead that he could remove and replace. Indeed, he cut Wife out of the Foundation they both owned. He moved for permission to distribute assets in this action, the court denied his request, but he did it anyway. He did not seek approval or consent to the decanting of trust assets and creation of new trusts, and proudly testified that he had no obligation to do so. Wife was never on equal footing with Husband; she served as Trustee and Managing Director of the LLCs at his will and was removed as soon as he decided to do so, when she no longer acquiesced in his demands.
In this regard, Hoffman, Markowitz, and R.S., are inapposite on their specific facts. First, these cases involved irrevocable trusts that held a single asset — a home or an insurance policy — and not, as here, the lion's share of the martial estate. Second, the parties in those cases were not the trustees and they had "relinquished control over the trust assets" (Hofmann, 155 AD3d 442; Markowitz, 146 AD3d 872; R.S., 151 AD3d 609). Here, to the contrary, Husband was the de facto Trustee and never relinquished control over the assets, which continue to be available to him (Exhibit 164).
To be clear, the Trusts are not a "sham" or a fraud upon the Court, created during the divorce proceedings to secret away assets, as in Surasi (2001 NY Slip Op 40408[u]). Rather, they were created during the marriage as legitimate vehicle to protect the parties' wealth for future generations. However, that fact alone does not prevent the Court from considering the value of trust assets in fashioning an equitable distribution award.
This case is also not entirely on all fours with Reichers, in which the wife was a beneficiary of the irrevocable family trust in her capacity as "Spouse of the Settlor," and would lose her interest in the marital assets held in trust upon the divorce (Reichers, 178 Misc 2d at [*26]172). However, while Wife is not a named or presumptive beneficiary of the Trusts, it cannot be said that she had no beneficial interest in the trust assets worthy of protection upon divorce. To the contrary, the record establishes that Wife has an interest such that the fundamental principles underlying equitable distribution mandate inclusion of the value of the Trusts in fashioning a distributive award.
As outlined ad nauseum above, Wife enjoyed and benefited from, in equal measure with Husband, the financial windfall occasioned by the Goldman Sachs buy-out throughout the marriage and reasonably anticipated the ability to enjoy the benefits of the trust assets in her lifetime. She helped create the homes and family life resulting from that windfall and expected to enjoy them into the future. Indeed, she gave up substantial martial assets in exchange for the Trusts' continued support of the family lifestyle. She gave up her lifetime gift tax exemption, she transferred assets to the Trusts for a substantially discounted note, portions of which Husband forgave, and she paid taxes on the Trust income. Thus, Wife is entitled to her fair share of the value of the Trust assets, which is a "thing[]of value that [she] helped to create and expect[ed] to enjoy at a future date" (Szypula, 42 NY3d at 624 [citing DeLuca v. DeLuca, 97 NY2d 139, 144 [2001]; DeJesus, 90 NY2d at 665). It is more than fair to conclude that had Wife known that she was forever giving up her right to marital assets, she would not have blindly signed off on the establishment of the Trusts, or the transfer of virtually all of the marital assets into the Trusts, or the relinquishment of her rights as Trustee, or any of the other actions taken by Husband of which she was informed (10/13/22 Tr.: "Because I trusted R. and it never in a million years did I ever imagine that I would be here today in this position") (cf. Oppenheim, 168 AD3d 1085; Hoffman, 155 AD3d 442).
The Court recognizes that it is, somewhat, writing into a gap in the law. However, upon careful consideration of the applicable principles, on this record, the inescapable conclusion must be that the value of the Trust assets are marital property within the meaning of DRL § 236 B (1) (c). The vast majority of marital assets are held in the Trusts, including the family homes (Torkin, 236 AD3d 1082; Yerushalmi, 136 AD3d 812). While the Trusts were legitimately set up to protect wealth for future generations, the family lifestyle has been and continues to be supported by and embedded in the Trusts (cf. Oppenheim, 168 AD3d 1085; Perdios, 135 AD3d 840; Hoffman, 155 AD3d 442; Markowitz, 146 AD3d 872; R.S., 151 AD3d 609). Husband has had and continues to maintain unrestricted control over and access to Trust assets and enjoys their use and benefit without interruption. On the other hand, Wife never had any control over the Trusts, LLCs, or assets; she was a figure-head who served in name only at Husband's pleasure. She did not have independent legal counsel to advise her on the creation of the Trusts and LLCs, and was not on "equal footing" with respect to their management. At the same time, however, Wife helped build the Trust assets by her contributions to the marriage, enjoyed their use and benefit during the marriage and had a reasonable expectation to share in their value and enjoy them in her lifetime (Szypula, 42 NY3d at 624 [citing DeLuca v DeLuca, 97 NY2d 139, 144 [2001]; DeJesus, 90 NY2d at 665). Thus, equity requires that the value of the Trusts be included in the marital estate and equitably distributed.
Given that DRL § 236 B (5) (d) and the applicable authorities addressing equitable distribution of trusts supports the conclusion herein, the Court need not look to the Debtor and Creditor Law, tax laws, or bankruptcy jurisprudence, as argued by Wife, to reach the correct, equitable result. 
The ample and undisputed evidence in the record establishes that the martial estate, the [*27]value of which is subject to equitable distribution, amounts in all to $181,469,321, consisting of Trust assets worth $111,225,848, and non-trust assets worth $70,243,473. As noted above, these values may have increased or decreased depending upon market forces and whether Husband used any additional marital funds from the Foundation accounts or any accounts held in his name.
Equitable Distribution of the Marital Estate
Now that the marital assets and their values are established, and considering all the circumstances and the sixteen DRL § 236 B (5) (d) factors, the court exercises its broad discretion to award Wife 50% of the value of the entire $181,469,321 marital estate (see Mahoney-Buntzman v Buntzman, 12 NY3d at 420 ["trial court has substantial flexibility in fashioning an appropriate decree based on what it views to be fair and equitable under the circumstances"]). This award — which amounts in all to the sum of $79,884,660 ($181,469,321 ÷ 2 = $90,734,660 - $10,850,000 distribution already paid), payable by transfer to Wife of all the non-trust assets, except the Sun Valley Home,[FN4]
and a distributive payment of $35,776,187, is equitable, just, and correct
This is a long-term marriage of nearly twenty-four years. Wife is 55, Husband is 64, and they are both in relatively good health (DRL § 236 B [5] [d] [2]). At the time of the marriage in 1994, Wife was earning $52,000 per year as a financial investment reporter and Husband was earning $2 million per year as a financial investment professional. They owned the [Upstate] Home and lived a comfortable Manhattan lifestyle. By the date of commencement, the parties were extremely wealthy as a result of the Goldman Sachs buy-out in 2000. They had Trust assets worth over $110 million, which included their $13 million Shorewood Court estate, their [Upstate] Home, $22 million Shelter Island investment property, and ETC, which traded $5.5 billion in assets. The parties also owned three Manhattan apartments, two on Central Park West, and the Park Avenue Home, together with several financial and investments accounts, all of which were worth approximately $70 million. The family living expenses and lifestyle have been paid by the Trusts since 2002, when Husband retired and stopped taking a salary (DRL § 236 B [5] [d] [1]).
Wife made positive direct and indirect contributions to the acquisition and development of marital property during the marriage (DRL § 236 B [5] [d] [7]). To be clear, the Goldman Sachs $6.5 billion buy-out of SL&K was a windfall to both parties. There is no proof in the record that, other than being an equity partner of SL&K at the time of the buy-out, Husband had any direct impact on, or participated in the negotiations resulting in, the astronomical buy-out figure. Wife indirectly contributed to the acquisition of marital assets pre-buy-out, and the growth of the marital assets post-buy-out. She dedicated her life to raising the children and taking care of the various family homes in Europe and New York. She arranged for each child's unique and specific educational and emotion needs, regardless of where the family lived. She loved working, she loved her jobs but left the workforce in 2004 at Husband's request. She nursed Husband back to health in 2004 and again in 2015 — 2016. Husband did not refute Wife's proof of the substantial and significant efforts she took to care for him, the children, and their [*28]homes. Her efforts in this regard allowed Husband to work as the Investment Advisor for M.B. and the Trust LLCs, as well as to become an equity partner and founder of ETC, and his work increased the value of marital assets from $120 to $180 million (see generally Cahen-Vorburger v Vorburger, 12 AD3d 275, 276 [1st Dept 2004] [increase in value of defendant business constituted marital property where defendant did not deny plaintiff indirect contributions "by being a homemaker for him and caregiver for the children"]).
Husband's probable future financial circumstances are quite good. Although 64, he still actively manages the Trust assets, worth over $110 million, and is a partner at ETC. Husband could draw a salary from ETC and for his work as Investment Advisor to the LLCs, if he chose to do so. He is in possession of the parties' art and other valuables acquired during the marriage. He has full and unfettered use of all trust assets, Shorewood Court and the [Upstate] Home, and enjoys the benefit of sweetheart leases on Shorewood Court and the [Upstate] Home. On the other hand, Wife, aged 55, has been out of the work force since 2004, has a business that lost over $30,000 in 2021, continues to receive treatment for her alcohol abuse disorder, and has been evicted from the family homes and cut off from the family's wealth (DRL § 236 B [5] [d] [9]).
The Court notes here that it is not bound by Husband's tax-returns to determine his yearly income (see Lennox v Weberman, 109 AD3d 703, 704 [1st Dept 2013] [court "may impute income based upon the party's past income or demonstrated earning potential"]; Warshaw v Warshaw, 173 AD3d 582, 583 [1st Dept 2019] [court "appropriately looked beyond defendant's most recent tax return to consider his earnings history"]; Andre v Warren, 192 AD2d 491, 491 [1st Dept 1993] [support magistrate properly imputed income to mother "in an amount exceeding that reported" in her Federal tax return]), and may impute income based on averaging earnings in prior tax returns (Bloom v Hilpert, 222 AD3d 574 [1st Dept 2023] [court can impute income based on averaging seven years of tax returns]; F.L. v J.M., 173 AD3d 428 [1st Dept 2019] [court can impute income by averaging income reported in recent returns]; see also Branche v Holloway, 124 AD3d 553 [1st Dept 2015] [imputation of $1 million yearly income "based on the fact that he earned in excess of $1 million annually from 2000 through 2009"]). Husband's last tax return from 2022 shows $1,552,484 in income (Exhibit 168). However, the Court imputes to Husband annual income of $2,830,087, representing his average yearly income from 2018 to 2022. This higher number appropriately considers Husband's earnings history as an investment professional, and accounts for his choice to remain underpaid by foregoing a salary as Investment Advisor to the LLCs and partner at ETC. Indeed, $2.8 million is a conservative figure considering he last earned $2 million per year in 2002 and could command a salary likely double that, if not more, with his nearly 40-year experience in financial markets. This amount also does not include imputed income based on the $17,300 per month financial benefit he realized from the below-market leases on Shorewood Court and the [Upstate] Home (which would amount to $207,600 per year).
It is impossible to evaluate each component part of the marital assets and to distribute them, as the majority of the assets are contained in the Trusts. The Court cannot dissolve the Trusts, and even if it could, dissolution would have catastrophic impact in the form of, inter alia, significant tax liabilities, loss of creditor protection and other possible legal ramifications. In this regard, there is an interest in retaining and maintaining the Trusts as is but including the value of their assets in the marital estate (DRL § 236 B [5] [d] [10]). Indeed, the equitable distribution award to Wife of all of the non-trust assets and a distributive payment in the sum of $35,776,187, takes into consideration that the majority of the assets are illiquid, as they are held [*29]in the Trusts and cannot be distributed (DRL § 236 B [5] [d] [8]). In order to make the $35,776,187 distributive payment (which will be made over time), if needed, Husband can borrow against trust assets to provide funds for himself under his expanded powers over the Property Trust (Exhibit 164). He can pay back any loan from income he earns as Investment Advisor and partner in ETC.
The parties did not submit any proof as to the tax consequences of the equitable distribution of their assets (DRL § 236B [5] [d] [11]). Where no evidence of tax liability is presented or tax consequences are highly speculative, the Court is not required to consider these potential tax liabilities in making a distributive award (Greenwald v Greenwald, 164 AD2d 706 [1st Dept 1991] [court not required to consider "highly speculative" tax liability in marking an equitable distribution of marital property]; Pickard v Pickard, 33 AD3d 202 [1st Dept 2006] ["Since plaintiff presented no evidence of the claimed tax implications of awarding defendant a credit against past excess payments, the court's failure to consider them was not error"]). However, the Court presumes that the transfer of the non-trust real properties and some of the investment accounts to Wife may have capital gains implications upon her sale or liquidation of such assets. It also notes that Wife gave up all or substantially all of her lifetime gift tax exemption to transfer marital assets into the Trusts. These facts support the distributive award of 50% of the value of the entire marital estate, which includes the value of the trust assets (DRL § 236 B [5] [d] [11]).
The distributive award also takes into consideration two crucial facts: Wife will lose her inheritance rights (DRL § 236 B [5] [d] [4]), and her health insurance benefits (DRL § 236 B [5] [d] [5]). It also accounts for the fact that Wife does not need to continue to reside in the Park Avenue Home. Indeed, the parties contracted to sell that home for $9,850,000 as neither presently primarily reside in New York and Wife is awarded the net sales proceeds thereof (expected to be $9.4 million). In addition, the equitable distribution award compensates her for her loss of use of Shorewood Court and [Upstate] Home (DRL § 236 B [5] [d] [3]). However, given the size of the distributive award, Wife is not awarded maintenance (DRL § 236 B [5] [d] [6]).
Post-commencement, Husband unequivocally, unreservedly and unilaterally cut Wife out of the Trusts, removed her as Managing Director of the LLCs, terminated her access to trust accounts, kicked her out of her homes with all of their attendant luxury accommodations, and cut her off from the family lifestyle. His transfer of the parties' remaining interest in M.B. to the GST, decanting of the Family Trust into the GST and then the GST into the Property and Investment Trusts, unauthorized distributions of marital assets to the tune of $21,800,000, assumption of total control over the Foundation, and purchase of the Sun Valley Home and 2022 Boat with marital assets, violated the Automatic Orders as well as specific orders of the court which denied his request to do so. As Husband failed to fully respond to Wife's trial subpoena, the record may not contain a complete and accurate picture of the marital assets, both within and without the Trusts. These violations and bad-faith post-commencement conduct amount to egregious economic fault and support the finding that the value of the marital estate shall be distributed 50% to Wife under the "statutory catchall 'just and proper' factor" of DRL § 236 B (5) (d) (16) (Owens v Owens, 107 AD3d 1171, 1175 [3d Dept 2013] [economic fault includes conduct that "unfairly prevents the court from making an equitable distribution of marital property" and "catchall factors provide 'substantial flexibility [to] fashion an appropriate decree based on what is . . . fair and equitable under the circumstances"] [internal citations omitted]; see [*30]generally Mohamed v Abuhamra, 222 AD3d 1344, 1346-47 [4th Dept 2023] [husband's post-commencement conduct in hiding accounts, transferring funds and scheme to underreport financial status and income constituted egregious economic fault and supported awarding wife 100% of known marital assets]; see also Branche v Holloway, 124 AD3d 553 [1st Dept 2015] [egregious economic fault, consisting of "liquidating, dissipating and failing to account" for assets supports unequal distribution of marital property]; Stewart v Stewart, 133 AD3d 493 [1st Dept 2015] [same]).
The Court declines to find that Husband wastefully dissipated marital assets. To the contrary, the record shows that the marital estate increased in value by about $60 million — from $120 million in 2002 to $180 million in 2018 — under Husband's management and control as Investment Advisor to the LLCs (DRL § 236 B [5] [d] [12]). Similarly, the Court declines to find that Husband transferred assets without fair consideration because the value of the assets within the GST will be considered in the martial estate and distributed equitably; in other words, Wife will receive fair consideration for her share of the Trust assets by this award (DRL § 236 B [5] [d] [12]).
Finally, per the 2020 amendment to DRL § 236 B (5) (d) (14), the Court must consider whether a party has committed acts of domestic violence, as that term is defined in the Social Services Law § 459 (a), and the "nature, extent, duration, and impact of such act or acts" in determining equitable distribution of martial assets. The legislative history of this relatively new provision reflects the clear intent to consider domestic violence and abuse within the marriage in making equitable distribution awards (Sponsor's Mem, Bill Jacket, 2019 NY Senate-Assembly Bill S6050, A1967 ["Domestic violence is a scrouge in our society. . . Abuse within a marriage must be considered in order to properly adjudicate its dissolution and the financial situation established."). The amended statute memorialized what the common-law recognized for years — distributive awards are meant to ensure that the equities are applied to reflect the contributions of each spouse to the partnership and to reach the right and just result as to marital property, especially where there is conduct within the marriage that shocks the conscience (Havell v Islam, 301 AD2d 339, 344 [1st Dept 2002] [where marital fault exists court compelled "to invoke its equitable power to do justice between the parties"]; Socci v Socci, 99 AD2d 287, 292 [2d Dept 1984] ["defendant's sustained physical abuse of the plaintiff over the course of their marriage constituted egregious marital fault to be factored into the equitable distribution award in addition to other considerations"]).
The record does not contain any evidence of domestic violence and abuse within the marriage. To the contrary, although Wife spoke of marital strife, and times where the parties were on rocky ground, her testimony generally reflected that she was happy and content. Rather, Husband engaged in emotional abuse after Wife filed for divorce. He evicted her from the family homes that she helped build and in which the children still reside; eliminated her name from Shorewood Court; cavalierly bulldozed her vegetable garden; angrily shouted at her to "get out" of the homes; disposed of her property and left a picture of his new girlfriend in its place — conduct which utterly disregarded not only her humanity but the years they spent together as a family. Husband's behavior was unwarranted and hateful. However, it did not amount to the type of egregious and uncivilized conduct within the marriage found to "bespeak of a blatant disregard of the marital relationship" (id.), or domestic violence within the marriage as contemplated by statute (compare J.N. v T.N., 77 Misc 3d 894 [Sup Ct, NY County 2022] [husband's sustained emotional and mental abuse of wife throughout marriage and into divorce [*31]proceedings warranted distributive award of 85% marital property to wife]; G.K. v S.T., 83 Misc 3d 1238[a] [Sup Ct, NY County 2024] [husband's sustained abuse of wife and children throughout marriage and into divorce proceedings warranted distributive award of 65% marital property to wife]).
MAINTENANCE
The amount and duration of maintenance is a matter committed to the sound discretion of the trial court (Rennock v Rennock, 203 AD3d 675 [1st Dept 2022]; Spencer v Spencer, 230 AD2d 645, 648 [1st Dept 1996]).
Pursuant to DRL § 236 B (6), the Court must determine the guideline amount of post-divorce maintenance based upon the parties' incomes and applying the prescribed formula. Income for maintenance (and child support) is governed by the Child Support Standards Act ("CSSA") (DRL §§ 240 [1-b] [b] [5]; 236 B [6] [b] [3]). Wife has negative income from earnings according to her 2021 tax return. The Court has already imputed annual income of $2,830,087 to Husband. After arriving at the parties' incomes, the Court performs two calculations up to a cap of $228,000 (DRL § 236 B [6] [c]). The lesser amount of the two calculations is the guideline amount of maintenance. Here, the guideline amount of maintenance is $45,600 per year, or $3,800 per month, which the Court could deviate from after consideration of the statutory factors (DRL § 236 B [6] [e]).
However, the Court declines to award any maintenance to Wife given her substantial equitable distribution award of over $79 million. As "the purpose of maintenance is to give the recipient spouse a sufficient period to become self-supporting" (Naimollah v De Ugarte, 18 AD3d 268, 271 [1st Dept 2005] [internal citation omitted]), a significant distributive award able to generate cash flow supports denial of post-divorce maintenance (Stewart, 133 AD3d at 495 [maintenance denied where less monied spouse received, inter alia, millions of dollars of assets in equitable distribution]; Hofmann v Hofmann, 173 AD3d 531, 533 [1st Dept 2019] ["The Referee's denial of post-divorce maintenance to defendant is supported by the record, which shows that defendant's distributive award — now substantially increased — would generate cash flow sufficient to render her self-supporting"]). Where the equitable division of marital assets is sufficient for the less monied spouse to enjoy the same standard of living post-divorce as enjoyed during the marriage, spousal maintenance is properly denied (id.; Diop v Gueye, 237 AD3d 1298, 1302 [3d Dept 2025]; Spencer-Forest v Forrest, 159 AD3d 762 [2d Dept 2018]).
The equitable distribution award provides Wife with over $79 million in assets, some cash, some investments, some real estate. She will have ample means to purchase a new apartment and a new summer home commensurate with the Park Avenue Home and Shorewood Court estate, with more than enough funds left over to invest and generate a cash flow sufficient to be self-supporting in the context of the marital standard of living (id.; cf. Owens, 107 AD3d at 1176-77). The Court notes also that Wife did not request, nor did Husband pay, temporary maintenance during the litigation. Consequently, the Court declines to award Wife maintenance under DRL § 236 B (6).
CHILD SUPPORT
The parties share equal parenting time of their two youngest daughters. All of the children's educational and medical expenses have been paid through their own trusts or by Husband; however, he has not paid basic child support to Wife. Husband, the monied spouse, is the noncustodial parent for the purposes of calculating child support (Conway v Gartmond, 144 AD3d 795, 797 [2d Dept 2016] ["Since the mother's income exceeds that of the father, she [*32]should be deemed the noncustodial parent for child support purposes" where parties have equal parenting time]).
As noted above, the parties' income for the purpose of calculating child support (DRL § 240 [1-b] [b] [5]) is $2,830,087 ($0 for Wife + $2,830,087 for Husband). Applying the statutory cap of $183,000, and using 25% for two children, results in a basic child support obligation of $45,750 per year or $3,812.50 per month (DRL §§ 240 [1-b] [2]; 240 [1-b] [3] [i]). Husband's share of the support obligation is 100%. The guideline child support amount, however, is unjust and inappropriate given the pre-divorce marital lifestyle and needs of the children.
Therefore, the Court will deviate from the income cap under the guidelines to set child support, and sets a $400,000 income cap to which it will apply the statutory percentages (Cassano v Cassano, 85 NY2d 649, 654 [1995] [when exceeding statutory cap, courts have discretion to apply the DRL § 240 [1-b] [f] factors "and/or" apply statutory percentages to income above cap]). A $400,000 income cap is appropriate given the financial resources of the parties and the children's standard of living during the marriage, as amply demonstrated in the trial record. With a $400,000 income cap, under the CSSA guidelines, the monthly basic child support obligation for two children is $8,333.
The first child support payment of $8,333 is due to Wife on October 1, 2025 and on the first day of each month thereafter, until [] is emancipated at which time Husband's monthly child support obligation will be $5,666. His child support obligation will end upon [] emancipation.
The child support award is retroactive to the date of commencement in May 2018, or for a period of 87 months (see generally Diamond v Diamond, 11 AD3d 289 [1st Dept 2004] [retroactive child support awarded even where there is an "extended amount of time between" request and award]). Retroactive child support amounts to $724,971 ($8,333 x 87 months; the arrears do not include support for three children, but could), which shall be paid in full within ninety (90) days of the date of this Decision and Order.
ATTORNEY'S FEES
DRL § 237 [a] provides counsel fees to a non-monied spouse "to enable that spouse to carry on or defend the action or proceeding, as, in the court's discretion, justice requires, having regard to the circumstances of the case and of the respective parties." An award of attorney's fees is a matter within the sound discretion of the trial court (DeBernardo v De Bernardo, 180 AD2d 500, 502 [1992] [trial court has "great flexibility in determining counsel fees"]).
In making the award, the court must give due regard for the financial circumstances of the parties and "all the other circumstances of the case, which may include the relative merit of the parties' positions" (DeCabrera v Cabrera-Rosete, 70 NY2d 879, 881 [1987]; Rennock v Rennock, 203 AD3d 675 [1st Dept 2022] [court properly considered financial need together with both parties' intransigent positions]). Where the monied spouse has taken unreasonable positions, caused unnecessary litigation, or engaged in obstructionist conduct an award of counsel fees to the non-monied spouse is appropriate (see e.g. Johnson v Chapin, 12 NY3d 461 [2009] [upholding award of $885,000 in attorney's and expert fees due to unnecessary delay and considering parties' financial positions]; Azizo v Azizo, 51 AD3d 438, 440—41 [1st Dept 2008] ["In light of the economic disparity between the parties and defendant's conduct during this action, the trial court providently exercised its discretion in awarding plaintiff counsel and expert fees"; attorney's fees of $664,538 and expert fees of $57,142 upheld]; but see Ansour v Ansour, 61 AD3d 536 [2009] [only a portion of attorney's fees awarded considering the distributive award and recipient party's conduct which unnecessarily complicated the action]).
The attorney's and expert fees awarded may be significant where parties have allegedly comingled marital and non-marital assets within a trust of significant value and the scope of the marital estate is expansive in both size and complexity (Trafelet v Trafelet, 162 AD3d 518 [1st Dept 2018] [interim attorney's and expert fees of $3.5 million warranted in divorce litigation involving $150 million trust and claims of comingling marital and non-marital assets within trust]).
The attorney's fees in this matter are indeed significant as a result of the complexity of the trust issues and the vast size of the marital estate. Wife submitted proof that she incurred $2,306,241.34 in attorney's fees — including divorce counsel and trusts and estate counsel — from the commencement of this proceeding in May 2018 through January 2023. The record contains invoices she received from Dobrish Michaels Gross LLP ($52,632.50 post-commencement); Boies Schiller Flexner LLP ($318,524.69); Chemtob Moss Forman & Beyda LLP ($1,184,734.09); The Law Firm of Laurence P. Greenberg ($368,428.43); Seth Ginsberg, Esq. ($150,790.50); and Katten Muchin Rosenman LLP ($193,202.38) (Exhibits 96-97, 99-101, 103). Wife also provided an email dated October 2022 showing that she incurred $37,928.75 in legal fees from Holland & Knight LLP (Exhibit 102). Crediting Husband with his $70,782.26 payment to Chemtob Moss Forman & Beyda LLP (Exhibit 99) — which appears to be his only payment of fees on behalf of Wife — the total attorney's fees incurred by her through January 2023 amount to $2,235,459.08. She also submitted proof that she incurred expert fees in the sum of $162,306.50 (Exhibit 107).
On this record, an award of counsel fees to Wife in the total sum of $1,676,594.25 or 75% of the $2,235,459 she seeks in fees incurred through January 2023, is appropriate as Wife is the non-monied spouse, and considering the lack of merit to Husband's position on equitable distribution of Trust assets, as well as his cavalier and controlling conduct over marital assets, including violations of the Automatic Orders. It also takes into consideration that Wife is not seeking attorney's fees incurred post January 2023, which are likely substantial as they would include time spent on six days of trial (2/23/23, 2/24/23, 3/2/23, 6/14/23, 4/15/24, and 4/16/24) and post-trial work.
Accordingly, Wife is awarded attorney's fees in the amount of $1,676,594.25, and $162,306.50 for expert fees, which shall be paid within thirty (30) days of the date of this Decision and Order.
Accordingly, it is hereby
ORDERED that the value of the marital estate to be equitably distributed includes the value of the Trust assets, in the sum of $111,225,848, and non-trust assets in the sum of $70,243,473, for a total value of $181,469,321; and it is further
ORDERED that Wife is entitled an equitable distribution award of 50% of the marital estate valued at $181,469,321, or $90,734,660, payable as follows:
(1) Credit for Post-Commencement Distributions Already Made: $10,850,000;
(2) Transfer of Financial and Investment Accounts to Wife:

ο Cevian Capital II

$ 3,176,222

ο [*33]Drawbridge Funds

$12,993,894

• Drawbridge Special Opportunities

$8,218,436

• 2013 RCA Withheld Distribution

$197,427

• 2109 RCA Withheld Distributions

$4,432,168

• DBSO Escrow Fund

$145,863

ο R.H. Revocable Trust 

$7,875,416

• Acct. xxxxx: 

$5,321,834

• Acct. xxxxx: 

$540,129

• Acct. xxxxx: 

$320,350

• Acct. xxxxx: 

$21,909

• Acct. xxxxx: 

$240,641

• Acct. xxxxx: 

$1,430,553

ο R.H. IRA Rollover Account xxxxx

$1,132,917

ο The R.H. and C.S.

Charitable Foundation Account xxxxx

$1,530,024

(3) Net Proceeds of Sale: 1175 Park Avenue, Unit 14A $ 9,400,000
(4) Transfer of Title to Real Estate:

ο 353 Central Park West, Unit 8 
     New York, New York 

$6,400,000

ο 353 Central Park West, Unit 2 
     New York, New York

$1,600,000

(5) Distributive Payment: $35,776,187     (Payable $3,577,618.70 per year over 10 years)
ORDERED that Husband shall transfer to Wife each of the foregoing financial and investment accounts within thirty (30) days of the date of this Decision and Order; and it is further
ORDERED that Husband shall transfer to Wife title to the two Central Park West [*34]apartments within thirty (30) day of the date of this Decision and Order. Husband shall be solely responsible for all transfer taxes and filing fees attendant to the transfers; and it is further
ORDERED that Husband shall pay to Wife the $35,776,187 equitable distributive payment at the rate of $3,577,618.70 per year for ten (10) years. The first distributive payment is due on November 15, 2025, and each annual payment thereafter is due on November 15th of each year, until November 15, 2034; and it is further
ORDERED that the parties' artwork shall be inventoried and appraised by a licensed art appraiser within one-hundred eighty (180) days of the date of this Decision and Order. The parties are each entitled to 50% of the total value of the artwork, which they may arrive at by dividing the artwork between them or selling it and equally splitting the proceeds; and it is further
ORDERED that Wife is awarded attorney's fees in the sum of $1,676,594.25 and expert fees in the sum of $162,306.50, which shall be paid within thirty (30) days of the date of this Decision and Order; and it is further
ORDERED that Wife is not awarded maintenance; and it is further
ORDERED that Husband shall pay monthly basic child support in the sum of $8,333, and 100% of add-ons, for the parties two youngest daughters. The first child support payment is due on October 1, 2025 and on the first day of each month thereafter, until [] is emancipated at which time Husband's monthly child support obligation will be $5,666. His child support obligation will end upon [] emancipation; and it is further
ORDERED that Husband's child support obligation is retroactive to date of commencement (May 2018), or for a period of 87 months, and his arrears amount to $724,971 ($8,333 x 87 months), which sum shall be paid in full within ninety (90) days of the date of this Decision and Order; and it is further
ORDERED that all other request for either equitable distribution or support are denied; and it is further
ORDERED that Wife shall submit to this Court for signature, upon notice to Husband (22 NYCRR § 202.48), a proposed Judgment of Divorce within thirty (30) days of this Decision and Order. 
Dated: September 8, 2025
HON. KATHLEEN WATERMAN-MARSHALL

Footnotes

Footnote 1:References to the trial transcripts are ([numerical date] Tr. [page]).

Footnote 2:A chart of the Trial Exhibits is attached hereto as an Addendum [omitted from published decision].

Footnote 3:As of April 2025, neither party primarily resides in New York City, according to their So-Ordered Stipulation addressing the sale of the Park Avenue Home.

Footnote 4:Wife is entitled to all accrued interest and any other increases in value to the financial and investment accounts transferred to her, without adjustment to the distributive payment of $35,776,187.